### CANON v THUMUDO
### DAVIS v LHIM
### HALL v HAN

Docket Nos. 77151, 77726, 77963. Argued March 4, 1987 (Calendar Nos. 8-10). Decided May 3, 1988.

Jack C. Canon and Beverly A. Canon, for themselves, and as guardians of Marcia Lynn Canon, brought a medical malpractice action in the Livingston Circuit Court against Livingston County Community Mental Health Services and Donna Thumudo and Dolores McKeon, nurses who were employed by the facility, alleging negligent psychiatric treatment of their daughter, Marcia, while an outpatient, which resulted in severe injuries to Marcia when she jumped from the second story window of her home. The court, Stanley J. Latreille, J., granted summary judgment for the defendants on the basis of governmental immunity. The Court of Appeals, R. B. BURNS, P.J., and BRONSON and TAHVONEN, JJ., affirmed, concluding that the alleged acts were discretionary (Docket No. 77820). The plaintiffs appeal.

Ruby Davis, as administratrix of the estate of Mollie Barnes, deceased, brought a wrongful death action in the Wayne Circuit Court against Dr. Yong-oh Lhim, a staff psychiatrist at Northville State Hospital, alleging negligence in discharging John Patterson, the decedent's son, from the hospital and in failing to warn the decedent that her son was a danger to her safety. The court, Lucile A. Watts, J., entered judgment on a jury verdict for the plaintiff for $500,000. The Court of Appeals, R. M. MAHER, P.J., and BRONSON, J. (CYNAR, J., dissenting), affirmed (Docket No. 59284). The case was remanded for reconsideration in light of *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567 (1984). On remand, the Court of Appeals

REFERENCES

Am Jur 2d, Hospitals and Asylums §§ 18, 20.

Am Jur 2d, Public Officers and Employees §§ 301, 362, 363.

Governmental tort liability for injuries caused by negligently released individual. 6 ALR4th 1155.

Immunity of public officer from liability for injuries caused by negligently released individual. 5 ALR4th 773.

again affirmed in an opinion per curiam (Docket No. 84500). The defendant appeals.

Estel Hall, as personal representative of the estate of Anna Bell Hall, deceased, brought a wrongful death action in the Wayne Circuit Court against Drs. Kyung S. Han, Redencion B. Lustre, and Don Spivak, alleging medical malpractice in the care of the decedent. The court, Susan D. Borman, J., granted accelerated judgment for Drs. Lustre and Spivak, and summary judgment for Dr. Han on the ground that as primary therapist and staff psychiatrist at the Detroit Psychiatric Institute he had at all times been acting within the scope of his employment and therefore was immune. The Court of Appeals, BEASLEY, P.J., and V. J. BRENNAN and CYNAR, JJ., affirmed in part and reversed in part, in an unpublished opinion per curiam, concluding that Dr. Han was immune from liability, except as to the allegations that he failed to execute or supervise the decedent's treatment plan which were ministerial acts (Docket No. 82879). The defendant appeals.

In an opinion by Justice GRIFFIN, joined by Chief Justice RILEY and Justices BRICKLEY and CAVANAGH, the Supreme Court *held:*

The exercise of judgment regarding the treatment of patients by government-employed mental health professionals is a discretionary-decisional act which, even if negligent, is immune from tort liability under the governmental immunity act. The relevant inquiry is not whether the act at issue was negligent, but whether it was discretionary-decisional, rather than ministerial-operational in nature.

1. In cases controlled by *Ross,* lower-level governmental officials, employees, and agents are immune from tort liability when, in good faith, they are acting in the course of their employment and are acting, or reasonably believe they are acting, under the scope of their authority and are performing discretionary-decisional, as opposed to ministerial-operational acts.

2. Discretionary-decisional acts are those which require personal deliberation, decision, and judgment. Ministerial acts are those which constitute merely an obedience to orders or the performance of a duty which involves little or no choice. The decision whether and how best to engage in a particular activity is discretionary-decisional, involving significant decision making, while the execution of the decision once made is ministerial-operational, involving only minor decision making. In determining whether an act is discretionary-decisional or ministerial-operational, a court must look to the specific act at

issue, rather than the general nature of the activity. Not every act which deviates from a professional norm may be characterized as ministerial-operational; discretion implies the right to be wrong. The concept of immunity presupposes that the activities which are the subject of a complaint may have been performed negligently, in violation of the requisite standard of care.

3. In *Canon,* the acts in issue related directly to the diagnosis, care, and treatment of the plaintiff, and each involved decision making rather than the mere following of a prescribed line of conduct. The alleged errors suggest a latitude of choice which is the essence of professional discretion. Under the circumstances, the defendant's activities were cloaked with immunity.

4. In *Hall,* a meaningful analysis of whether the defendant's actions were discretionary or ministerial is not possible on the basis of the record, and further factual development is required. The trial court erred in granting summary judgment, requiring remand to the trial court for further proceedings without prejudice to the filing and consideration of a motion for summary disposition under MCR 2.116(C)(7).

5. In *Davis,* the defendant's determinations that a patient's condition did not require involuntary hospitalization under the Mental Health Code and that the patient was not a danger to the safety of the decedent were highly discretionary and may not be transformed into ministerial acts merely because they proved to be wrong.

Justice LEVIN, joined by Justice ARCHER, writing separately, stated that while a decision whether a person is to be admitted to or discharged from a government mental hospital is immune from liability under *Ross* as a discretionary-decisional act, the actual care of a patient in a hospital or as an outpatient is a ministerial-operational act and is not immune.

Under *Ross,* decisions concerning the extent of government interaction were classified as discretionary-decisional, while decisions incidental to the operation of an actual program were ministerial operations. A government doctor should not be deemed immune from tort liability merely because of employment by the government. Actions and decisions should be deemed immune only when the doctor is acting as a uniquely *governmental* doctor, such as when determining the scope of the government's involvement with a particular patient. While decisions to admit or release patients from government facilities thus may be deserving of immunity, routine medical decisions—diagnoses, prescriptions, and structuring of treatment

plans—should not be so shielded by the Supreme Court in the declaration of the common law of Michigan from accountability for malpractice.

The test in *Ross* was offered as a general test to be applied to governmental employees; it was not suggested that the test should or would be modified when the question of liability involved doctors and nurses. Modification of the test is especially inappropriate in light of the Legislature's decision after *Ross* to establish for the first time legislatively the scope of officer and employee immunity from tort liability and so to narrow the statement in *Ross* of the common-law scope of such immunity.

In *Canon* and *Davis,* the decisions whether to provide further hospitalization for the patients were immune. All the other claims of negligence concerning inpatient and outpatient care are not immune and, in *Canon* and *Hall,* should be remanded for trial on the merits. The issues raised in *Davis,* other than the issue whether to further hospitalize, should be addressed by the Supreme Court on the merits.

*Canon,* affirmed.

*Hall,* affirmed and remanded.

*Davis,* reversed and remanded.

Justice BOYLE, writing separately, stated that *Canon* should be remanded for further proceedings. To the extent that the plaintiffs' pleadings allege a failure to rehospitalize, summary judgment was proper. However, the complaint can be read as encompassing an allegation of failure to supervise and execute within the definition of ministerial activities articulated in *Ross.* To the extent that discovery may reveal the existence of applicable safety standards, a decision that an alleged deviation should be characterized as ministerial or discretionary is premature. In *Canon,* it is unclear whether the plaintiffs are alleging that defendants were negligent in failing to establish a supervision program or in carrying out a policy otherwise required.

In *Davis,* the decision not to involuntarily commit was immune under *Ross.* The decision not to provide a warning to a third person was incident to the decision not to commit—a decision whether or not to engage in a particular activity well within the immunity parameter of *Ross.* Any act of a professional that deviates from professional standards, ipso facto, is not ministerial. Likewise, the fact that an individual defendant is a professional employee will not insulate the conduct in question from liability, particularly where safety standards may have been established by policy or practice and there are

alleged deviations in execution or supervision. Because the distinction between discretionary and ministerial acts is not a distinction that judicial, academic or practicing lawyers have been able to define, it would be well to proceed cautiously, particularly when examining the question in the context of a review of a motion for summary disposition.

144 Mich App 604; 375 NW2d 773 (1985) affirmed.

147 Mich App 8; 382 NW2d 195 (1985) reversed.

1. GOVERNMENTAL IMMUNITY — TORTS — GOVERNMENT EMPLOYEES — MENTAL HEALTH PROFESSIONALS.

The exercise of judgment regarding the treatment of patients by government-employed mental health professionals is a discretionary-decisional act which, even if negligent, is immune from tort liability under the governmental immunity act; the relevant inquiry is not whether the act at issue was negligent, but whether it was discretionary-decisional, rather than ministerial-operational in nature (MCL 691.1401 *et seq.;* MSA 3.996[101] *et seq.*).

2. GOVERNMENTAL IMMUNITY — TORTS — GOVERNMENT EMPLOYEES.

Lower-level governmental officials, employees, and agents are immune from tort liability when, in good faith, they are acting in the course of their employment and are acting, or reasonably believe they are acting, under the scope of their authority and are performing discretionary-decisional, as opposed to ministerial-operational acts (MCL 691.1401 *et seq.;* MSA 3.996[101] *et seq.*).

3. GOVERNMENTAL IMMUNITY — DISCRETIONARY ACTS — MINISTERIAL ACTS.

Discretionary-decisional acts are those which require personal deliberation, decision, and judgment; ministerial acts are those which constitute merely an obedience to orders or the performance of a duty which involves little or no choice; the decision whether and how best to engage in a particular activity is discretionary-decisional, involving significant decision making, while the execution of the decision once made is ministerial-operational, involving only minor decision making (MCL 691.1401 *et seq.;* MSA 3.996[101] *et seq.*).

*The O'Bryan Law Center* (by *D. Michael O'Bryan*) for plaintiffs Canon.

*Lopatin, Miller, Freedman, Bluestone, Erlich, Rosen & Bartnick* (by *Monica Farris Linkner*) for plaintiff Davis.

*Cummings, McClorey, Davis & Acho, P.C.* (by *Owen J. Cummings* and *Edward E. Salah*), for defendants Thumudo and McKeon.

*Frank J. Kelley*, Attorney General, *Louis J. Caruso*, Solicitor General, and *George L. McCarger* and *Mark S. Meadows*, Assistant Attorneys General, for defendant Lhim, and *Thomas R. Wheeker*, Assistant Attorney General, for defendant Han.

Amici Curiae:

*Ennis, Friedman, Bersoff & Ewing* (by *Donald N. Bersoff, Laurel Pyke Malson,* and *Kit Adelman-Pierson*) for American Psychological Association.

*Onek, Klein & Farr* (by *Joel Klein* and *Paul M. Smith*) for Michigan Psychiatric Society.

*Thomas Downs, P.C.,* for Michigan Psychological Association.

*Libner, VanLeuven & Kortering, P.C.* (by *John A. Braden*), for Michigan Trial Lawyers Association.

GRIFFIN, J. In each of these cases we must decide whether a government-employed mental health professional was protected by immunity from tort liability for particular acts performed in the course of employment. We resolve these cases under our ruling in *Ross v Consumers Power Co*

*(On Rehearing)*, 420 Mich 567; 363 NW2d 641 (1984).[1]

The facts of each case will be addressed separately. First, however, we shall review the dichotomy established in *Ross* which controls the outcome of these cases—the distinction between acts which are discretionary-decisional and those which are ministerial-operational.[2]

I

The governmental immunity act, MCL 691.1401 *et seq.;* MSA 3.996(101) *et seq.,* enacted in 1964, did not address whether or when immunity from tort liability is available to individuals as officers, employees, and agents of a governmental agency. The judicial debate which ensued regarding the scope of individual immunity led to a resolution by this Court in *Ross.* The *Ross* Court declared lower-level governmental officials, employees, and agents to be immune from tort liability when they are:

(1) acting during the course of their employment and acting, or reasonably believe they are acting, within the scope of their authority;
(2) acting in good faith; and
(3) performing discretionary, as opposed to ministerial acts. [*Id.,* pp 633-634.]

It is not disputed that each of the defendants in these cases is a "lower-level" government em-

[1] *Canon, Davis,* and *Hall* were all pending in courts below as of the date of the *Ross* decision, and the immunity issue was in all instances preserved for appellate review. See *Hyde v Univ of Michigan Regents,* 426 Mich 223, 230; 393 NW2d 847 (1986).

[2] 1986 PA 175, which amended the governmental immunity act, MCL 691.1401 *et seq.;* MSA 3.996(101) *et seq.,* eliminates the judicially created discretionary/ministerial dichotomy, and makes other changes in the law of individual immunity. By its terms the act made such changes effective as to cases arising after June 30, 1986. Each of these cases arose prior to that date.

ployee within the meaning of *Ross*. Furthermore,
the plaintiff in each case has conceded, either
below or in argument before this Court, that the
defendant neither acted in bad faith nor was en-
gaged in ultra vires activities, i.e., acts outside the
scope of employment. Accordingly, the issue in
each case is whether the allegedly negligent activ-
ity on the part of the defendant was ministerial in
nature, rather than discretionary.

In *Ross*, we explained the distinction between
"discretionary" and "ministerial" acts as follows:

> "Discretionary" acts have been defined as those
> which require personal deliberation, decision, and
> judgment. Prosser [Torts (4th ed)], § 132, p 988.
> This definition encompasses more than quasi-judi-
> cial or policy-making authority, which typically is
> granted only to members of administrative tribu-
> nals, prosecutors, and higher level executives.
> However, it does not encompass every trivial deci-
> sion, such as "the driving of a nail," which may be
> involved in performing an activity. For clarity, we
> would add the word "decisional" so the operative
> term would be "discretionary-decisional" acts.
>
> "Ministerial" acts have been defined as those
> which constituted merely an obedience to orders or
> the performance of a duty in which the individual
> has little or no choice. *Id.* We believe that this
> definition is not sufficiently broad. An individual
> who decides whether to engage in a particular
> activity and how best to carry it out engages in
> discretionary activity. However, the actual execu-
> tion of this decision by the same individual is a
> ministerial act, which must be performed in a
> nontortious manner. In a nutshell, the distinction
> between "discretionary" and "ministerial" acts is
> that the former involves significant decision-mak-
> ing, while the latter involves the execution of a
> decision and might entail some minor decision-
> making. Here too, for clarity, we would add the
> word "operational" so the operative term would be

"ministerial-operational" acts. [*Ross, supra,* pp 634-635. See also *Bandfield v Wood,* 421 Mich 774; 364 NW2d 280 (1985).]

The *Ross* decision directs courts to look to "the specific acts complained of, rather than the general nature of the activity . . . . The ultimate goal is to afford the officer, employee, or agent enough freedom to decide the best method of carrying out his or her duties, while ensuring that the goal is realized in a conscientious manner." *Id.,* p 635.

In light of its broad implications, we reject at the outset a definition of "ministerial" which one Court of Appeals panel has sought to impose upon government-employed professionals. We refer to the theory advanced below in *Davis v Lhim (On Remand),* 147 Mich App 8, 12-15; 382 NW2d 195 (1985), lv gtd 425 Mich 851 (1986), that any act of a professional which deviates from professional standards is, ipso facto, ministerial in nature. In that case, the panel's majority opined:

Implicit in the Supreme Court's explanation [in *Ross*] is the recognition that to decide whether or not to engage in a particular activity means that either alternative would be permissible. We conclude that the Supreme Court did not intend to shield from liability persons who were faced with doing something permissible or something impermissible—merely because it was a theoretical option. Where an individual is faced with such a "choice," we conclude that the Supreme Court intended that situation to be placed in the "ministerial-operational" category. . . .

. . . A professional, otherwise liable because he or she has deviated from the appropriate standard of care, cannot contend that he or she had discretion to violate that standard.

Thus, in terms of *Ross* defendant was required to be "obedient" to a standard and perform his

duties consistent therewith, having "little or no choice" in the matter, the *minimal* definition of a ministerial-operational activity. As stated in *Ross, supra,* p 635, ministerial acts "must be performed in a non-tortious manner."

To adopt such a definition for "ministerial" would come close to eliminating all immunity for professionals by confusing the issues of immunity and negligence. The distinction is significant. If every act which deviates from a professional norm were to be categorized as "ministerial," immunity would seldom shield professional discretion. Nothing in *Ross, supra,* hints at such a drastic limitation on the scope of individual immunity. To the contrary, in *Ross,* we cited with approval Justice EDWARDS' observation in *Williams v Detroit,* 364 Mich 231, 261-262; 111 NW2d 1 (1961), that " '[d]iscretion implies the right to be wrong.' " *Ross, supra,* p 628. The very concept of immunity presupposes that the activities complained of may have been negligently performed—i.e., in violation of the requisite standard of care. In protecting significant decision making on the part of public employees from tort liability, *Ross* intended "to ensure that a decision-maker is free to devise the best overall solution to a particular problem, undeterred by the fear that those few people who are injured by the decision will bring suit." *Ross, supra,* p 631. Courts should take care not to confuse their separate inquiries into immunity and negligence.[3]

---

[3] The authors of one treatise on torts have provided this commentary on the tendency of some courts to confuse the issue of negligence with the issue of discretionary immunity:

[W]here the government's activity is affirmative, specific, and in violation of a statute, regulation or constitutional provision imposing a duty upon government, courts are often willing to say there is no room for discretion. The presence of a pre-

II

In *Canon,* plaintiffs Jack and Beverly Canon brought suit for injuries sustained by their daughter Marcia when she jumped from the second story of her parents' home on July 29, 1981. Marcia had been an outpatient at the Livingston County Community Mental Health Services (LCCMHS), a government-owned mental health facility. Although the suit originally named other defendants and included other claims, this appeal involves only the plaintiffs' claims of negligence against Donna Thumudo, M.S.P.S., and Dolores McKeon, R.N., two nurses employed by LCCMHS.[4]

existing safety standard, or any appropriate standard governing the activity in question, will also tend to displace the room that otherwise exists for government discretion and immunity. And the absence of such a standard leads to the conclusion that the activity in question is discretionary. . . . [T]here may be no basis for evaluating an administrative decision that denies a patient admission to a hospital, but there is a safety standard for treatment once he is admitted, with the result that there is immunity in the first case but not the second. . . .

All this may be a way of saying that courts have confused the issues of duty and negligence on the one hand with the issue of the discretionary immunity on the other. It seems fairly clear in at least some of the cases that courts have decided negligence or duty issues under the guise of "discretion." Perhaps this has not always led to a bad result, but the difference is quite important in many cases. The discretionary immunity issue, often viewed as jurisdictional, is usually resolved on motion to dismiss or on summary judgment motion— in other words, resolved without a full trial on the merits. If this device is in fact used to decide negligence and duty issues, the judge is likely to be acting without adequate factual development. [Prosser & Keeton, Torts (5th ed), ch 25, § 131, pp 1041-1043. See also *id.,* p 1066; *Williams v Detroit,* 364 Mich 231; 111 NW2d 1 (1961); *Gregoire v Biddle,* 177 F2d 579, 581 (CA 2, 1949); *Muskopf v Corning Hosp Dist,* 55 Cal 2d 211; 11 Cal Rptr 89; 359 P2d 457 (1961).]

[4] Originally, plaintiffs also named LCCMHS and Dr. Michael H. Bernstein, a psychiatrist, as defendants, and alleged breach of implied contract as well as negligence. The trial court granted summary judgment on both counts for all of the defendants. On appeal, the Court of Appeals reversed with regard to plaintiffs' allegation of

The Livingston Circuit Court entered summary judgment in favor of defendants Thumudo and McKeon, and the Court of Appeals affirmed.[5] We granted leave to appeal.[6]

The record on appeal indicates that prior to Marcia's outpatient treatment at LCCMHS, she had a history of drug abuse and suicide attempts. At her mother's request, she had been admitted to Mercywood Hospital for psychiatric treatment following a November 13, 1979, suicide attempt in which she slit her wrists. In addition to a reference to suicide as a "notable caution," the Mercywood file on Marcia included information concerning an incident in which Marcia's parents found a butcher knife in her bedroom, as well as an admission by Marcia of drug and alcohol use.

Following Marcia's release from Mercywood Hospital, she received psychiatric care on an outpatient basis at LCCMHS from Dr. Michael H. Bernstein, a psychiatrist, and from nurses McKeon and Thumudo. However, because Marcia's parents saw no improvement in her condition, they decided to have her readmitted to Mercywood Hospital. The suicide attempt which gave rise to this suit occurred soon after Marcia learned that she was to be readmitted to Mercywood Hospital. She was then twenty years old.

Plaintiffs' second amended complaint alleges in pertinent part the following breaches of duty by Thumudo and McKeon:

---

breach of implied contract against LCCMHS only. Plaintiffs sought leave to appeal in the Supreme Court from the Court of Appeals affirmance of summary judgment for McKeon and Thumudo and Dr. Bernstein, but did not seek leave to appeal from the decision affirming summary judgment for LCCMHS. Dr. Bernstein has been dismissed from the suit by stipulation. We denied LCCMHS' cross-application for leave to appeal the Court of Appeals reversal of summary judgment on the breach of implied contract claim. 425 Mich 851 (1986).

[5] 144 Mich App 604; 375 NW2d 773 (1985).

[6] 425 Mich 851 (1986).

(c) Failure of Donna Thumudo M.S.P.S. and Dolores McKeon R.N. to heed the calls for help of Beverly A. Canon whereby said Defendants were advised of Marcia Canon's deteriorating condition, and, take the appropriate steps of referral, consultation, therapy and/or hospitalization necessitated in the premises;

(d) Failure of Donna Thumudo M.S.P.S. and Dolores McKeon R.N. to detect the deteriorating mental condition of Marcia Canon in their scheduled meetings with her, whereby they failed to cause, institute, or recommend necessitated therapy and/or hospitalization;

(e) Failure of Defendants to cause, advise, or undertake the hospitalization of Marcia Canon;

(f) Failure of Defendants to properly undertake, prescribe and monitor a coördinated program of treatment and counseling of and therapy for Marcia Canon;

(g) Failure of Defendants to advise that Marcia Canon's bedroom not be on a second story with a door leading outside without a landing.

The Court of Appeals concluded that "[t]he alleged breaches were all discretionary acts."

We agree that the breaches alleged in subparagraphs (c), (d), (e), and (g) relate directly to the diagnosis, care, and treatment of Marcia, and each involved decision making rather than the mere following of a prescribed line of conduct. These alleged errors in judgment suggest a latitude of choice which is the essence of professional discretion. As we previously held in *Zavala v Zinser,* 420 Mich 659-660 (companion case to *Ross*), "The determination of what type of action to take . . . is a discretionary-decisional act entitled to immunity."

In subparagraph (f) of their complaint, plaintiffs allege that defendants failed "to properly under-

take, prescribe and monitor a coördinated program of treatment . . . ."[7]

Plaintiffs urge that this subparagraph should be construed as alleging a claim of negligent supervision which, in *Willis v Dep't of Social Services,* 420 Mich 639, and *Regulski v Murphy,* 420 Mich 650, has been interpreted pursuant to *Ross* to be ministerial-operational in nature.

In *Regulski, supra,* p 651, the plaintiff high school student was injured while taking a building trades class which was offered as part of the school's vocational education program. The plaintiff alleged that the program director and the class instructor were negligent in instructing, warning, and supervising him. This Court held that "[i]nstruction and supervision are essentially ministerial-operational activities for which there is no immunity from tort liability." In *Willis, supra,* p 640, the plaintiff's decedent was a resident of a juvenile care facility operated by the defendant Department of Social Services. The boy drowned in the course of a swimming outing supervised by facility staff members. Once again this Court found that "the care and supervision of the participating children . . . were ministerial-operational acts that entailed only minor decision-making."

While the act alleged—that two LCCMHS staff members failed to properly monitor a coördinated program of treatment for Marcia—might ordinarily be deemed ministerial-operational because it seemingly involves following a prescribed line of conduct, under the facts presented in *Canon* the specific act complained of in subparagraph (f) is in fact discretionary-decisional in nature. It is signifi-

[7] In plaintiffs' brief in this Court, the following footnote makes clear what should otherwise be obvious: "The failure to undertake and prescribe would apply to the former co-Defendant, psychiatrist, only." Thus, with respect to defendants Thumudo and McKeon, we are concerned only with the alleged failure to *monitor* treatment.

cant that, unlike the plaintiffs in *Willis* and *Regulski*, Marcia suffered her self-inflicted injuries not while in the custody of defendants, but while she was an outpatient in the custody of her parents. The allegation must be read not as a failure to supervise, since constant supervision was neither required nor possible on an outpatient basis, but as a failure to professionally evaluate on a continuing basis the suitability of Marcia's participation in the outpatient program. The exercise of professional judgment and discretion is an integral facet of a mental health professional's opinion regarding the propriety and effectiveness of a course of treatment. Under the circumstances, we conclude that defendants' activities were cloaked with immunity.

The conclusion we reach is reinforced by the underlying policy of the Mental Health Code, MCL 330.1001 *et seq.;* MSA 14.800(1) *et seq.* In 1974, the Michigan Legislature declared it to be the policy of this state to encourage discharge of mentally ill patients whenever possible so they may be allowed to function as part of society. As a means of effectuating this shift from the earlier policy of confinement, the Legislature authorized establishment throughout the state of community mental health systems to make treatment for the mentally ill easily available on an outpatient basis. The county community mental health program has served the important social purpose of maximizing the personal freedom of those who are mentally ill by allowing them to function in the least restrictive environment. The system has also widened the range of available services, including outpatient services. *Jackson v New Center Community Mental Health Services,* 158 Mich App 25, 31-32; 404 NW2d 688 (1987). The Livingston County Community Mental Health Services is one of those facilities, and defendants Thumudo and McKeon were employed pursuant to that policy.

To withdraw the cloak of immunity from the individual defendants under these particular circumstances would be to inhibit the rehabilitative programs which are the cornerstone of the Mental Health Code.

III

In *Hall,* we are required to decide whether activity on the part of a government-employed psychiatrist which gave rise to a negligence claim was discretionary-decisional or ministerial-operational in nature. On April 3, 1981, plaintiff's decedent, Anna Bell Hall, was admitted to the Detroit Psychiatric Institute, which is operated by the Michigan Department of Mental Health. She was diagnosed as suffering from depression and paranoia, but her physical condition was described as normal.

Seven days later, on April 10, Mrs. Hall began refusing to consume food or liquid. She was seen at about noon that day by the defendant, Kyung S. Han, M.D., a state employee on the staff of the institute. After noting that Mrs. Hall would not eat or drink, Dr. Han "recommended forcing medications and necessary procedures to avoid a life-threatening situation."

During the evening of April 10, Mrs. Hall began running a high fever, had a blank stare, and became dehydrated. At 7:35 A.M. on the next morning, she was discovered lying on the floor in a very serious condition: hyperventilating, sweating profusely, gasping, shaking, and mumbling incoherently. At that point, Mrs. Hall was seen not by Dr. Han but by two other physicians. One, Dr. Don Spivak, ordered Valium for Mrs. Hall and attended to some bruises. The other, Dr. Redencion B. Lustre, described by plaintiff as the physician on-call, sent her that same morning to Henry Ford

Hospital for emergency treatment.[8] She arrived at the Ford hospital at approximately 11:00 A.M. Later that day she died from cardiac arrest.

The trial court granted Dr. Han summary judgment on the ground that at all times he had been acting within the scope of his employment, and was therefore immune under *Knapp v Moreno,* 137 Mich App 769; 359 NW2d 560 (1984).[9] Thereafter, the Court of Appeals, applying the then newly released *Ross* decision of this Court, affirmed in part and reversed in part the decision of the trial court:

We believe that the treatment ordered by defendant including the decision relative to: 1) the extent to which decedent's blood would be tested; 2) the frequency by which her blood pressure would be checked and her respiration, temperature and pulse monitored; and, 3) prescribing drugs for decedent involved significant decision-making. These acts were therefore discretionary acts for which defendant was cloaked with individual governmental immunity. Our review of this case, however, does not end here.

Plaintiff's complaint further alleges that defendant essentially breached his duty of care by failing to execute and/or supervise the execution of the treatment plan. The execution of the treatment plan involved minor decision-making and is therefore defined as a ministerial act under *Ross.* Hence, if defendant breached any duty relative to the execution of the treatment plan, he was not cloaked with individual immunity. [Unpublished

[8] On September 28, 1983, the trial court granted accelerated judgment for Drs. Lustre and Spivak for the reason that a proper complaint had not been filed against them before the expiration of the statute of limitations. The Court of Appeals affirmed (unpublished opinion of the Court of Appeals, decided July 7, 1984 [Docket No. 74351]), and leave to appeal to this Court was not sought.

[9] The scope-of-employment test applied in *Knapp* was superseded by the *Ross* three-part test for lower-level governmental officers, employees, and agents. See *Ross, supra,* pp 630, 633-634.

opinion, decided January 13, 1986 (Docket No. 82879).]

In its opinion, the Court of Appeals seems to suggest that it was enough for plaintiff in the instant case to allege failure on the part of defendant "to execute and/or supervise the execution of the treatment plan." The Court concludes that "if defendant breached *any* duty relative to the execution of the treatment plan, he was not cloaked with individual immunity." (Emphasis supplied.) We find such an analysis to be inadequate, particularly on the basis of the complaint which is reviewed in this case.

Once again, we stated in *Ross, supra,* p 635, that "to determine the existence and scope of the individual's immunity from tort liability in a particular situation, the *specific acts complained of, rather than the general nature of the activity,* must be examined." (Emphasis supplied.) A plaintiff who merely asserts that a governmental employee has failed "to execute and/or supervise" a treatment plan describes only the general nature of activity and falls short of providing a basis for ruling upon the discretionary/ministerial distinction.

We conclude that a meaningful analysis of Dr. Han's actions, i.e., whether they were discretionary or ministerial, or both, cannot be carried out on the basis of the present state of the record. This case is before us on appeal from an order granting defendant's motion for summary judgment pursuant to GCR 1963, 117.2(1), now MCR 2.116(C)(8), which tested the legal basis of the complaint. Defendant indicated that the motion was made "for the reason that plaintiff has failed to plead any facts in avoidance of governmental immunity . . . ."

A motion under GCR 1963, 117.2(1) would have been appropriate if plaintiff had attempted in the complaint to state a cause of action against a governmental *entity* entitled to immunity.[10] However, individual immunity, as distinguished from sovereign or governmental immunity, is an affirmative defense which is appropriately raised by a motion under MCR 2.116(C)(7). As the Court of Appeals observed in *Hoffman v Genesee Co,* 157 Mich App 1, 7-8; 403 NW2d 485 (1987):

> [G]overnmental immunity when asserted by an employee of government constitutes a defense which, by reason of affirmative matter, seeks to avoid the legal effect of a plaintiff's claims. As such, in a cause of action against a governmental employee, governmental immunity must be classified as an affirmative defense under former GCR 1963, 111.7, now MCR 2.111(F)(3). See 1 Honigman & Hawkins, Michigan Court Rules Annotated, p 201, Comment 3D; see also 1 Martin, Dean & Webster, Michigan Court Rules Practice, p 192, Comment 6b.
>
> Consequently upon the maintenance of an action against a governmental employee, as distinguished from a governmental entity, a plaintiff need not plead facts in avoidance of immunity in his or her complaint. See *Booth Newspapers, Inc v U of M Regents,* 93 Mich App 100, 109; 286 NW2d 55 (1979). Thus, a trial court, when considering if a plaintiff has stated a claim against a governmental

---

[10] Unlike a claim of individual immunity, sovereign and governmental immunity are not affirmative defenses, but characteristics of government which prevent imposition of tort liability. A plaintiff therefore bears the burden of pleading facts in the complaint which show that the action is not barred by the governmental immunity act. MCL 691.1401 *et seq.;* MSA 3.996(101) *et seq.* This may be accomplished by pleading facts which show that the tort occurred during the exercise of a nongovernmental or proprietary function or by stating a claim which fits within one of the statutory exceptions. *Hyde, supra,* p 261, n 35; *Ross, supra,* p 621, n 34; *Galli v Kirkeby,* 398 Mich 527, 541; 248 NW2d 149 (1976); *McCann v Michigan,* 398 Mich 65, 77, n 1; 247 NW2d 521 (1976).

employee under GCR 1963, 117.2(1), now MCR
2.116(C)(8), should analyze the pleadings without
reference to governmental immunity. If govern-
mental immunity is to be asserted as a basis for
summary disposition on behalf of a governmental
employee, it should be raised under MCR
2.116(C)(7), i.e., the plaintiff's claim is barred be-
cause of immunity granted by law.[11]

Although the mislabeling of a motion will not
necessarily preclude review where the record is
adequate, we find it would be premature, consider-
ing the posture of this case, to determine whether
plaintiff's claim against this governmental em-
ployee is barred by individual immunity granted
by law.

Plaintiff essentially contends that, once a life-
threatening situation was identified, the standard
of care required of defendant included administra-
tion or monitoring of the treatment he prescribed.
These allegations are not unrelated to plaintiff's
assertion that Dr. Han was the "primary therapist
and staff psychiatrist" in charge of the decedent's
care. Plaintiff has alleged that Dr. Han "recom-
mended forcing medication and necessary proce-
dures to avoid a life threatening situation." How-
ever, plaintiff's complaint does not specify what
"medication" was prescribed by Dr. Han, nor does
it indicate specifically what "procedures" were
recommended by Dr. Han.

According to plaintiff, Dr. Han did not take
"appropriate measures" to prevent the decedent's
death. The "appropriate measures," in plaintiff's
estimation, included blood testing, the monitoring
and recording of blood pressure, pulse, tempera-

---

[11] Although the ground of individual immunity should be raised in
a defendant's first responsive pleading, MCR 2.116(D)(2), a motion for
summary disposition on that ground, i.e., the claim is barred by
immunity granted by law, may be filed at any time. MCR 2.116(B)(2).

ture and respiration, and the administering of fluids intravenously. Plaintiff avers that Dr. Han breached the applicable standard of care by failing "to order" the above procedures and by failing "to confirm" that such measures had been undertaken.

If the "necessary procedures" recommended by Dr. Han were different than those deemed by plaintiff to be "appropriate," Dr. Han might have been guilty of negligence in so deciding, but his medical decision would have been cloaked with immunity. It is not clear from the face of the complaint whether the "necessary procedures" recommended by Dr. Han were the same or different, nor is it clear whether Dr. Han's treatment plan, if different, was implemented by him or by others.

Since plaintiff was not required to plead avoidance of immunity, and further factual development regarding Dr. Han's role in the decedent's treatment is required, we agree that the trial court erred in granting summary judgment on the basis of this record. We remand to the trial court for further proceedings without prejudice to the filing and consideration of a motion pursuant to MCR 2.116(C)(7).

IV

Finally, we address the facts in *Davis*. This action arose from an incident which occurred on November 2, 1975, when Mollie Barnes was shot and killed by her son, John Patterson. Two months prior to the shooting, Patterson had been a voluntarily hospitalized patient at the Northville State Hospital. The plaintiff, who is administratrix of Mollie Barnes' estate as well as Patterson's aunt, alleged that defendant Dr. Lhim, a staff psychiatrist, was negligent in discharging Patter-

son from Northville and in failing to warn Barnes that Patterson was a danger to her safety.

Prior to the time of the shooting, Patterson had been admitted to Northville on six different occasions. In 1972, he was transferred to Northville shortly after he was brought to Detroit General Hospital by police at the request of plaintiff. In 1973, he was admitted to Northville for a second time pursuant to a temporary court order. It is not clear from the record whether his third and fourth admissions were voluntary or involuntary. However, it is clear that his fifth and sixth admissions were pursuant to "Formal Voluntary Orders," i.e., Patterson had requested admission.

Dr. Lhim first came in contact with Patterson on his fifth admission. Dr. Lhim diagnosed him as a schizophrenic, as had previous doctors who had examined him.

The Northville records include notations concerning Patterson's paranoid delusions, sleeplessness, hearing voices of God and the devil, and disturbed thought processes. He had been placed on antipsychotic medication. The Northville records reflect that in 1973 plaintiff told personnel at Detroit General Hospital that Patterson "acts strangely and keeps threatening his mother for money."

The record on appeal also indicates that Patterson had a history of heroin addiction and alcohol abuse when not confined to Northville. From 1970 to 1972, he served a term in Jackson prison for purse snatching. While in prison, he attempted suicide by slitting his wrists. His prison records show no incidents of significant violence toward others. His first admission to Northville in 1972 occurred two months after he was released from prison.

When Patterson was admitted to the hospital for

the sixth time on August 21, 1975, a social worker noted that there was a consensus among the "psychiatric team" that Patterson "tends to use the hospital like a motel as a means of getting away from the stress in the home situation." The plaintiff, Patterson's aunt, also had complained that Patterson used the hospital as a "motel."

On September 2, 1975, Patterson requested in writing that he be released from Northville. Dr. Lhim determined that Patterson did not meet the statutory requirements for involuntary hospitalization and authorized his release on September 3, 1975. Prior to making the release decision, Dr. Lhim met with Patterson and arranged for him to be given a twenty-eight day supply of medication.

At the time of the release, a social worker contacted plaintiff to inform her of Patterson's discharge. Plaintiff spoke with "somebody" at Northville and requested that Patterson be kept at the hospital because she was afraid of him and because his mother, Mollie Barnes, had not returned to Michigan. Barnes was in Alabama visiting her father who was ill with cancer.

According to plaintiff, about two months after his discharge Patterson became difficult to manage. For that reason, plaintiff took him to Alabama to be with his mother. Shortly after arriving at the home where his mother was staying in Alabama, Patterson found a gun under a cushion and began firing at random. When his mother, Mollie Barnes, entered the room, she was struck by a bullet and killed.

The Wayne Circuit Court jury awarded plaintiff a verdict of $500,000 against Dr. Lhim. The Court of Appeals affirmed in a two-to-one decision.[12] In lieu of granting leave to appeal, we remanded the

[12] 124 Mich App 291; 335 NW2d 481 (1983).

case to the Court of Appeals for reconsideration in light of *Ross.* The Court of Appeals in a split decision again affirmed the trial court judgment,[13] and we then granted leave to appeal.

Because Patterson was a patient who had been voluntarily admitted, Dr. Lhim and the Northville administrator were required by statute to release Patterson within three days of his written request unless commitment procedures set forth in § 420 of Michigan's Mental Health Code were initiated. MCL 330.1419(1); MSA 14.800(419)(1). The statute provides that after such a patient requests release, an application for involuntary hospitalization shall be filed in court if it is determined that the patient is "a person requiring treatment as defined in [the statute] and should remain in the hospital . . . ." MCL 330.1420; MSA 14.800(420). The relevant language in MCL 330.1401; MSA 14.800(401) defines a "person requiring treatment" as, inter alia:

> (a) A person who is mentally ill, and who as a result of that mental illness can reasonably be expected within the near future to intentionally or unintentionally seriously physically injure himself or another person, and who has engaged in an act or acts or made significant threats that are substantially supportive of the expectation.
>
> (b) A person who is mentally ill, and who as a result of that mental illness is unable to attend to those of his basic physical needs such as food, clothing, or shelter that must be attended to in order for him to avoid serious harm in the near future, and who has demonstrated that inability by failing to attend to those basic physical needs.
>
> (c) A person who is mentally ill, whose judgment is so impaired that he is unable to understand his need for treatment and whose continued behavior as a result of this mental illness can reasonably be expected, on the basis of competent medical opin-

---

[13] 147 Mich App 8; 382 NW2d 195 (1985).

ion, to result in significant physical harm to himself or others. This person shall be hospitalized only under the provisions of sections 434 through 438 of this act.

Without focusing on whether the decision to release or initiate commitment proceedings required the exercise of substantial discretion, the Court of Appeals majority concluded that Dr. Lhim's judgment was constrained by the "relevant standard of care . . . [the conduct] of a reasonable psychiatrist practicing medicine in the light of present-day scientific knowledge." *Davis,* 147 Mich App 15.

We reiterate that the relevant inquiry is not whether the specific act complained of was negligent, but whether it was discretionary-decisional in nature. In other words, we ask whether Dr. Lhim was essentially engaged in decision making or in the execution of a treatment program or plan when he failed to involuntarily hospitalize Patterson.

This Court has previously recognized, albeit in a different context, that the decision by a professional to release a hospitalized mental patient is a discretionary act. In *Teasel v Dep't of Mental Health,* 419 Mich 390; 355 NW2d 75 (1984), we recognized the discretion that such decisions entail.[14] Discussing the decision to discharge a patient, the Court stated:

---

[14] In *Teasel,* the plaintiff was charged with separate instances of carrying a concealed weapon and criminal sexual conduct. While the latter charge was pending, the probate court, on the petition of plaintiff's mother, ordered him committed to the Clinton Valley Center as mentally ill. Plaintiff was released four days later and incarcerated in jail pending trial. Plaintiff's brother then brought an action as his next friend against the Department of Mental Health, its director, and the director of the Clinton Valley Center, seeking an injunction compelling his immediate return to a state mental hospital until he no longer required treatment. The complaint alleged that the

Manifestly, the decision whether a hospitalized patient is "clinically suitable for discharge" or "no longer meets the criteria of a person requiring treatment" is a matter of professional judgment. The nature of psychiatric care and treatment to be provided to a hospitalized patient and the decision whether treatment is any longer necessary are matters calling for the exercise of informed medical judgment of a highly specialized sort. [*Id.,* pp 407-408. See also p 414.][15]

In the context of deciding the parameters of immunity applicable to governmental employees, other courts have likewise concluded that decisions made by professionals concerning diagnosis and discharge of a mental patient are highly discretionary. For instance, in *Fuhrmann v Hattaway,* 109 Mich App 429, 436-437; 311 NW2d 379 (1981), lv den 414 Mich 858 (1982), it was held:

Plainly, the activities of the defendant psychiatrists are anything but ministerial. The decisions required of these persons are perhaps the ultimate in discretion. To determine the state of a person's psyche is in itself a task requiring great discretion and when this task is conjoined with the even more imposing job of resolving another's liberty,

---

defendant directors failed to review his clinical status to determine whether he was still a person requiring treatment before discharging him from hospitalization. This Court remanded the case to the circuit court for an evidentiary hearing to determine whether the decision to discharge Mr. Teasel from hospitalization was an informed judgment made in conformity with the provisions of the Mental Health Code.

[15] Although stating that this decision was judgmental and discretionary, the *Teasel* Court also held that an official deciding to release a judicially hospitalized patient must make an informed decision "according to the criteria for discharge established by the Legislature." *Id.,* p 409. In this case, Dr. Lhim's decision was in fact based on the statutory criteria; the appellee's argument is simply that Dr. Lhim wrongly decided that the statutory criteria were not satisfied. This is exactly the type of judgment that the Court found to be clearly discretionary in *Teasel.*

the consequent decision cannot be said to be "min-isterial" in any sense of that word.

*   *   *

Finally, there seems to be little doubt that medical decision-making is inherently discretionary. [Citation omitted.] This, again, is particularly true in the field of psychiatry.[16]

We think that Dr. Lhim is correct in arguing that he "was called upon to determine the state of Mr. Patterson's psyche in conjunction with the determination of his liberty." Dr. Lhim's determination that an application for involuntary commitment was unwarranted involved "significant decision-making." *Ross, supra,* p 635. Dr. Lhim had access to certain facts about his patient, and he was required to determine whether those facts met criteria set forth in MCL 330.1401; MSA 14.800(401). In our view, this is the essence of a professional's decision-making role. His highly discretionary decision—that the statutory criteria were not satisfied—should not be transformed into a "ministerial" act simply by determining later, with the benefit of hindsight, that his decision was wrong.

We conclude that Dr. Lhim's determination that Patterson should not be involuntarily hospitalized was discretionary-decisional in nature and therefore immune from tort liability under *Ross.*

---

[16] See also *Fisher v Michigan,* 422 Mich 884; 368 NW2d 229 (1985) (Order); *Pomilee v Detroit,* 121 Mich App 121, 125; 328 NW2d 595 (1982), lv den 422 Mich 891 (1985); *Hamilton v Reynolds,* 129 Mich App 375; 341 NW2d 152 (1983), lv den 422 Mich 891 (1985); *Adams v Northville State Hosp,* 131 Mich App 583; 345 NW2d 207 (1983), lv den 422 Mich 891 (1985); *Tobias v Phelps,* 144 Mich App 272; 375 NW2d 365 (1985), lv den 424 Mich 859 (1985); *Brown v Northville Regional Psychiatric Hosp,* 153 Mich App 300; 395 NW2d 18 (1986). Some of these cases, including *Fuhrmann,* were decided prior to *Ross,* but are not in conflict with its holding.

V

In *Davis,* the plaintiff was allowed to amend her complaint to allege that Dr. Lhim negligently failed to warn Mollie Barnes that Patterson was a danger to her safety. Plaintiff contends that the relationship between psychiatrist and patient gave rise to a legal duty which enabled Dr. Lhim to be held liable for the injuries of plaintiff's decedent caused by Patterson.

The alleged failure by Dr. Lhim to warn or otherwise protect Mollie Barnes cannot be viewed in this case as a ministerial omission. On the contrary, like the decision not to seek involuntary hospitalization of a patient, the decision whether to warn a third party when a patient is released requires highly professional judgment involving the careful consideration of a number of factors. The alleged failure to warn in this case is inextricably related to Dr. Lhim's discretionary determination that involuntary commitment was unwarranted. As noted above, the statutory criteria for determining whether a patient should be involuntarily committed require professional judgment as to whether the patient can reasonably be expected within the near future to seriously physically injure another person and whether acts or threats by the patient are supportive of such an expectation. MCL 330.1400a, 330.1401(a); MSA 14.800(400a), 14.800(401)(a). Accordingly, when Dr. Lhim exercised his professional judgment and determined that Patterson's condition did not require involuntary hospitalization, his decision necessarily included an assessment of Patterson's propensity to harm third persons, including Mollie Barnes.

A mental health professional who is, or should be, aware of a patient's threat to a third person is

required to assess the likelihood that the threat will be acted upon. This involves consideration and balancing of such factors as the clinical diagnosis of the patient, the context and manner in which the threat is uttered, the patient's opportunity to act on the threat, the patient's past history of violence, the factors, if any, that provoked the threat and whether they are likely to continue, the patient's response to treatment, and the patient's relationship with the specified victim. If the mental health professional concludes that the threat presents a serious risk, then he must decide what action to take. In some situations, it may be appropriate to warn authorities or the specified victim. Certainly, to reach such a choice requires that the mental health professional exercise "personal deliberation, decision, and judgment." *Ross, supra,* p 634.[17]

The facts now before the Court serve to illustrate the degree to which such determinations can be "discretionary-decisional." Although Patterson had tried on one occasion to take his own life, there was no evidence of a history of significant violent behavior on his part towards others. The only evidence of a "threat" by Patterson was a two-year-old entry in the emergency room records of Detroit General Hospital. The notation quoted plaintiff, Patterson's aunt, as saying that Patter-

---

[17] We note, by way of analogy, our statement in *Zavala v Zinser, supra,* pp 659-660, to the effect that

[p]olice officers, especially when faced with a potentially dangerous situation, must be given a wide degree of discretion in determining what type of action will best ensure the safety of the individuals involved and the general public, the cessation of unlawful conduct, and the apprehension of wrongdoers. The determination of what type of action to take, e.g., make an immediate arrest, pursue a suspect, issue a warning, await backup assistance, etc., is a discretionary-decisional act entitled to immunity.

son " 'paces the floor and acts strangely and keeps threatening his mother for money.' " *Davis,* 124 Mich App 306. The reported threats were made directly to the victim, not to Dr. Lhim. Accordingly, at the time of Patterson's release, the victim, Patterson's mother, was aware of whatever threat or threats had been directed to her. Under these circumstances, Dr. Lhim was required to make a professional judgment which involved consideration of such factors as the seriousness of the two-year-old report, the effect of therapy administered since then, the effect that intervention would have on future therapy, and whether intervention on his part would be appropriate or necessary. We conclude that reaching such a determination, which requires, inter alia, professional evaluation of the state of a patient's mental health, is discretionary-decisional in nature. Dr. Lhim is therefore entitled to immunity from tort liability.

In light of our conclusion that Dr. Lhim's actions fall within the scope of immunity provided under *Ross,* we need not decide in this case whether a duty to warn should be imposed upon mental health professionals to protect third persons from dangers posed by patients.[18]

---

[18] We recognize that several other jurisdictions have found such a duty, the seminal case being *Tarasoff v Regents of Univ of California,* 17 Cal 3d 425; 131 Cal Rptr 14; 551 P2d 334 (1976). In *Tarasoff,* the patient communicated to his therapists specific threats and his intention to kill an unnamed, but readily identifiable girl. The therapists informed law enforcement authorities of these threats, but failed to warn the girl or her parents. The court explained:

When a therapist determines, or pursuant to the standards of his profession should determine, that his patient presents a serious danger of violence to another, he incurs an obligation to use reasonable care to protect the intended victim against such danger. The discharge of this duty may require the therapist to take one or more of various steps, depending upon the nature of the case. Thus it may call for him to warn the intended victim or others likely to apprise the victim of the danger, to notify the police, or to take whatever other steps are reason-

VI

Accordingly, in *Canon* we affirm the decision of
the Court of Appeals.

In *Hall,* we affirm the decision of the Court of
Appeals and remand to the trial court for further
proceedings not inconsistent with this opinion.

In *Davis,* we reverse the decision of the Court of
Appeals and remand the case to the trial court for
entry of judgment consistent with this opinion.

RILEY, C.J., and BRICKLEY and CAVANAGH, JJ.,
concurred with GRIFFIN, J.

LEVIN, J. *(separate opinion)*. In these cases, con-
solidated on appeal, the opinion of the Court holds
that the defendant nurses and physicians in *Canon*
and *Davis,* employees of governmental hospitals,
are immune from liability for malpractice because
they were "performing discretionary-decisional, as

ably necessary under the circumstances. [*Tarasoff, supra,* p 431.
See also *Jablonski v United States,* 712 F2d 391 (CA 9, 1983);
*Hicks v United States,* 167 US App DC 169; 511 F2d 407 (1975);
*Brady v Hopper,* 570 F Supp 1333 (D Colo, 1983); *Lipari v
Sears, Roebuck & Co,* 497 F Supp 185 (D Neb, 1980); *McIntosh
v Milano,* 168 NJ Super 466; 403 A2d 500 (1979).]

We note that the *Tarasoff* court first determined that under its
interpretation of the California statute the state-employed defendants
were not entitled to governmental immunity.

Moreover, the instant case contrasts sharply with the facts in
*Tarasoff* and its progeny, where in each of those cases the patient
conveyed specific and express threats to the psychotherapist that he
intended to harm a readily identifiable victim.

The only real evidence of Patterson's dangerousness was an entry
in the emergency room record two years prior to his mother's death,
which was based on an unverified oral report submitted by Patter-
son's aunt that Patterson "keeps threatening his mother for money."

There is no evidence in the record that Patterson had ever threat-
ened to kill his mother, ever repeated his two-year-old threat, or
exhibited any violent behavior or aggressive emotion to Dr. Lhim. Dr.
Tanay, who testified for plaintiff, admitted on cross-examination at
trial that Patterson had made "[n]o specific threats toward his
mother, to my knowledge."

opposed to ministerial-operational, acts" within the meaning of *Ross v Consumers Power Co (On Rehearing),* 420 Mich 567, 592; 363 NW2d 641 (1984), when rendering the services that are the bases of plaintiffs' claims. In *Hall,* the Court remands for further development of the record.

The question presented is, I agree, controlled by *Ross.* I write separately because the Court misapplies and expands *Ross* in the instant cases.[1] I agree that the decision whether to admit a person to, or discharge him from, a governmental mental hospital is, under *Ross,* immune as a discretionary-decisional act, but the actual care of a patient, whether in a hospital or as an outpatient, is a ministerial-operational act and not immune.

I

In three of the cases consolidated in *Ross,* the Court considered claims against governmental employees. The Court held that police officers' decisions to wait for backup assistance rather than intervene, the decision of a director of a youth home to take children on a swimming outing, and a school principal's decision to offer a class of instruction, as well as their decisions to allow particular persons to go on the swimming outing or be admitted into the classroom, were discretionary and decisional in nature. But, said this Court

[1] The opinion of the Court holds:

In *Canon,* that nurses McKeon and Thumudo are immune from liability for outpatient care of Marcia Canon who was injured when she jumped from the second story of her parents' home.

In *Hall,* the trial court erred in granting summary judgment. The complaint is not of sufficient specificity to determine whether the acts alleged to have been committed by Dr. Han were ministerial or discretionary. That cause is remanded for further proceedings.

In *Davis,* that Dr. Lhim is immune from liability for the shooting death of the mother of a patient discharged from Northville State Hospital.

in *Ross,* the execution of those decisions: the manner in which a suspect is pursued and arrested, the instruction, care and supervision of children on a swimming outing or in a classroom, are essentially ministerial-operational activities involving only minor decision making for which there is no immunity from tort liability.[2] In sum, decisions

---

[2] *Willis,* 420 Mich 638, one of the *Ross* consolidated cases, was a negligence action against a director, a counselor, and a student intern at a juvenile care facility for delinquent and neglected youths operated by the Department of Social Services that arose out of the drowning of one of the children during a swimming outing. The Court said:

> Assuming that each defendant had the authority to, and in fact did, decide who would participate in the outing, as well as when and where it would be conducted, we hold that these were discretionary-decisional acts entitled to immunity. However, the execution of these decisions, which included the care and supervision of the participating children, were ministerial-operational acts that entailed only minor decision-making. [*Id.,* pp 639-640.]

The Court found that the director's hiring of the counselor and the intern was similarly immune as a discretionary-decisional act.

In *Regulski,* 420 Mich 648, another of the consolidated cases, the plaintiff was a seventeen-year-old high school student who injured his eye during a building trades class. The Court declared that the director of the vocational program and the classroom instructor would have been immune from liability for claims that they were negligent in offering the class, in allowing the plaintiff to participate, or in deciding where and when to conduct the class because such acts are "discretionary-decisional in nature." *Id.,* p 651. But, the defendants were subject to liability for negligence "in instructing, warning, and supervising him," the Court noting that "[a]lthough some decision-making is involved in these activities, it is relatively minor." *Id.* Concluding that "[i]nstruction and supervision are essentially ministerial-operational activities for which there is no immunity from tort liability," the case was remanded for trial. The Court said:

> It is unclear whether plaintiff alleged that the individual defendants were negligent in establishing the type and extent of safety measures, or merely failed to provide that which was required by statute and school policy. If any of the defendants were responsible for establishing the school's policy as to the type of eye protective devices that would be provided to the students, the type of first-aid supplies to have at the building site, and what emergency transportation measures would be provided, that defendant is immune from tort liability because

concerning the extent of government interaction were classified as discretionary-decisional under *Ross* while decisions incidental to the operation of the actual program were ministerial-operational.

In *Canon,* the majority recharacterizes the allegations of the defendant; instead of a failure to supervise, the Court sees a failure to "professionally evaluate on a continuing basis the suitability of Marcia's participation in the outpatient program."[3] To be sure, at some point malpractice in evaluating a patient's continuing participation in an outpatient program might include a failure to rehospitalize, a decision that is immune under *Ross.* The jury in *Canon* could and should, on the remand for trial that I would order, be instructed that insofar as plaintiffs' claim is based on a failure to rehospitalize Marcia Canon the defendant nurses are immune from liability; however, damages may be assessed if the jury finds negligent outpatient care separate and apart from a failure to rehospitalize.

these are discretionary-decisional acts. However, the individuals can be held liable for failing to comply with § 1288 and the school's safety policy since the actual provision of eye protective devices, first-aid supplies, and emergency transportation involves only ministerial-operational acts. [*Id.,* 651.]

In *Zavala,* 420 Mich 657, still another of the consolidated cases, the Court held that police officers were immune from liability to a plaintiff who was injured in a fight outside a bar. The officers had observed the altercation and immediately called for backup assistance which arrived six to ten minutes later. The Court said that the "determination of what type of action to take, e.g., make an immediate arrest, pursue a subject, issue a warning, await backup assistance, etc., is a discretionary-decisional act entitled to immunity." *Id.,* pp 659-660. The Court went on to observe that "[o]nce that decision has been made, however, the execution thereof must be performed in a proper manner, e.g., the arrest must be made without excessive force, the pursuit of the suspect must not be done negligently, the request for assistance must include reasonably accurate information, etc." *Id.,* p 660. No allegations having been made of negligence in the execution of ministerial acts, the cause was not remanded for trial.

[3] *Ante,* p 340.

In *Hall,* the majority concludes that the trial court erred in granting summary judgment because, on the basis of the record, it is unclear whether Dr. Han's acts should be considered discretionary or ministerial. The question of immunity cannot be resolved without further factual development, and thus the majority orders a remand.

None of the acts or omissions alleged against Dr. Han involved decisions to initiate or discontinue the relationship between the government facility and Anna Bell Hall. The allegations are identical to malpractice claims filed and litigated against private physicians.

In *Davis,* Dr. Lhim's failure to initiate the involuntary commitment of John Patterson after Patterson's request for release from voluntary hospitalization is, I agree, immune under *Ross.* The question whether Dr. Lhim was negligent in failing to warn Mollie Barnes that her son might be dangerous to her is closely related to whether Dr. Lhim should have sought involuntary commitment of Patterson. Nevertheless, the question whether the state should assume responsibility for the fulltime care of a mental patient is quite different from the question whether there has been a violation of a standard of medical care requiring that a warning be provided to a third person. The latter seems to be incident to the decision not to seek involuntary commitment and closer to a ministerial-operational act for which there is no immunity.

While a higher degree of skill and judgment may indeed be required of a nurse or physician than is required of a counselor or school teacher, all those persons, in the performance of their duties, must observe the standards of care associated with their positions. The majority changes

the *Ross* test by finding that there is a relevant distinction for purposes of resolving the immunity question between the *professional* judgment and discretion exercised by a nurse or physician and the judgment and discretion exercised by a teacher or counselor. In adding the word "professional" when discussing the discretion of nurses and doctors, the Court underscores its modification of the *Ross* definition. The Court is essentially saying that the day-to-day judgments made by medical professionals are different from those made by other governmental employees. While that is not inaccurate, it is not pertinent when characterizing the particular employee's acts as either discretionary-decisional or ministerial-operational.

Under *Ross,* a governmental employee's acts are immune if he is performing discretionary-decisional acts in good faith and within the scope of his employment. When the *Ross* test was declared, it was offered as a general test to apply to all categories of governmental employees.[4] The Court did not suggest that the test should or would be modified when the activities of highly skilled employees, such as doctors or nurses, were involved. Modification of the *Ross* test to expand the scope of immunity is especially inappropriate in light of the post-*Ross* decision of the Legislature to establish for the first time legislatively the scope of officer and employee immunity from tort liability and, in so doing, narrow the *Ross* statement of the common-law scope of such immunity.[5]

II

Federal and state court application of compara-

---

[4] With exceptions (judicial and executive) not here relevant.

[5] 1986 PA 175, MCL 691.1401; MSA 3.996(101). See *Hyde v Univ of Michigan Regents,* 426 Mich 223; 393 NW2d 847 (1986).

ble discretionary-ministerial tests to doctors and nurses indicates that medical diagnoses, prescriptions, and care are ministerial-operational acts that are not and should not be regarded as being immune from tort liability.

In *Davis v Knud-Hansen Memorial Hosp*, 635 F2d 179, 186 (CA 3, 1980), a government doctor was denied immunity with respect to his treatment of a patient's compound bone fracture. The court said:

> Although an evaluation entailing professional judgment may be required, that does not transform the performance of a task which is essentially ministerial, no matter how high the skill required in its performance, into one which is discretionary.

Under the federal decisions,[6] doctors in the private and public sectors are held to the same standard of care. In holding that a governmental psychologist and a psychiatrist were not immune, the United States Court of Appeals for the Second Circuit observed:

> [C]omplaints attacking discretionary decisions may frequently raise questions which are political and nonjusticiable in nature, but here the judgments arrived at by the doctors are not different in kind or complexity from those which courts are accustomed to entertain when tort suits are brought against private physicians. [*Hendry v United States*, 418 F2d 774, 783 (CA 2, 1969).][7]

---

[6] See, e.g., *Spencer v General Hosp of Dist of Columbia*, 138 US App DC 48; 425 F2d 479 (1969); *Henderson v Bluemink*, 167 US App DC 161; 511 F2d 399 (1974); *Hendry v United States*, 418 F2d 774 (CA 2, 1969); *Jackson v Kelly*, 557 F2d 735 (CA 10, 1977); *Davis v Knud-Hansen Memorial Hosp, supra; Costley v United States*, 181 F2d 723 (CA 5, 1950).

[7] The common law of malpractice, as normally applied to private doctors and hospitals, already grants the leeway prop-

A number of state courts have adopted the federal approach. In *Comley v Emanuel Lutheran Charity Bd,* 35 Or App 465, 479; 582 P2d 443 (1978), a medical malpractice action was brought against two state-employed doctors, among others, on behalf of an infant who was permanently blinded as a result of the allegedly negligent prescription, administration and supervision of postnatal oxygen therapy. The court made the traditional ministerial-discretionary inquiry and concluded that the doctors' actions should not be shielded from immunity:

> [T]he alleged acts involved the same balancing of risk against benefit which every physician must undertake in treating patients and which every individual must undertake in fulfilling his or her duty of care to other individual members of society, whether in or out of government.

The Court acknowledged that some decisions of government hospital personnel will be considered "discretionary" under its analysis, such as eligibility for treatment and hospital admission, but said that there is always a "ministerial duty to provide treatment nonnegligently."[8]

In Missouri, the ministerial-discretionary formulation is stated in terms closely resembling those adopted in *Ross,* with "ministerial" duties defined as "those of a clerical nature performed in obedience to mandate without the exercise of judg-

---

erly left for expert judgment in the relatively stringent requirements it imposes upon plaintiffs in medical negligence suits. No further leeway is required for the publicly employed doctor or the public hospital than for their private counterparts. [*Spencer v General Hosp of Dist of Columbia,* n 6 *supra,* p 58 (Wright, J., concurring).]

[8] *Id.,* 477. See also *Costley v United States,* n 6 *supra.*

ment."[9] *State ex rel Eli Lilly & Co v Geartner,* 619 SW2d 761, 765 (Mo App, 1981). While this definition might suggest that any decision involving judgment would be labeled "discretionary," the court clarified its use of the term "discretion" in the immunity context, holding that the defendants' decision to administer sodium Amytal was not immune.[10]

A government doctor should not be deemed immune from tort liability merely because he is employed by the government. His actions and decisions should be deemed immune only when he is acting as a uniquely *governmental* doctor, such as when he is determining the scope of the government's involvement with a particular patient. While decisions to admit or release patients from government facilities may thus be deserving of immunity, routine medical decisions—diagnoses, prescriptions, and structuring of treatment plans—should not be so shielded by this Court in the declaration of the common law of this state from accountability for malpractice.

III

In obedience to this Court's application of the *Ross* test in the *Ross* consolidated cases concerning the execution of decisions by government teachers, counselors, and police officers, and pursuant to decisions in other jurisdictions defining the scope of governmental physician and nurse immunity

[9] *Ross, supra,* p 634, defined "ministerial" acts as "those which constitute merely an obedience to orders or the performance of a duty in which the individual has little or no choice."

[10] See also *Cooper v Bowers,* 706 SW2d 542 (Mo App, 1986); *Comley, supra; Watson v St Annes Hosp,* 68 Ill App 3d 1048; 386 NE2d 885 (1979); *Tilton v Dougherty,* 126 NH 294; 493 A2d 442 (1985).

from tort liability,[11] the decisions in *Canon* and *Davis* not to provide further hospitalization of Marcia Canon and John Patterson are, I agree, immune. All the other claims of negligence concerning inpatient and outpatient care are not immune and should, in *Canon,* and, I agree, in *Hall,* be remanded for trial on the merits. The remaining issues in *Davis* should be addressed by this Court on the merits.

ARCHER, J., concurred with LEVIN, J.

BOYLE, J. (*separate opinion*). I concur with the majority result in *Hall* and in *Davis.* In *Canon* I would remand for further proceedings. I write separately to express my view as to why such action is appropriate.

First, in my judgment, the majority opinion is over inclusive in its formulation of discretionary immunity under *Ross,* while the separate opinion is under inclusive, *Ross v Consumers Power Co (On Rehearing),* 420 Mich 567; 363 NW2d 641 (1984).

Thus, while I agree with Justice LEVIN's view that *Ross* did not suggest a relevant distinction between the professional judgment of a governmental employee and that of other governmental professionals or employees that are not members of a profession, and that *Ross* held that execution of decisions is essentially ministerial, I do not

---

[11] There is nothing peculiarly governmental about the activities of a doctor employed on the staff of a public, rather than a private, hospital, nor about the activities of a worker employed on a street project, rather than on building a private driveway for a private employer. Employments such as these might well be deemed *not* to be governmental in character for the purpose of determining the applicability of the defense. [Cooperrider, *The court, the legislature, and governmental tort liability in Michigan,* 72 Mich L R 187, 284 (1973).]

agree with the implicit suggestion that *Ross* held that only decisions concerning the extent of government interaction were discretionary decisions.[1]

Specifically, I agree with the majority and the separate opinion that, to the extent plaintiffs' pleadings in *Canon* allege a failure to rehospitalize, summary judgment was properly granted. However, I would remand *Canon* for further proceedings. I read paragraph (f) of plaintiffs' complaint as encompassing an alleged failure to supervise and execute within the *Ross* definition of ministerial activities. Further, to the extent that discovery may reveal the existence of "safety standards"[2] applicable to the situation, it would be premature to decide at this time that an alleged deviation should be characterized as ministerial or discretionary.

We noted in *Ross* that an individual can be held liable for failing to comply with an agency policy "since the actual provision of [safety devices] involves only ministerial-operational acts." *Id.* at 651. As in *Regulski v Murphy,* companion case to *Ross, id.* at 648, it is unclear whether plaintiffs in *Canon* are alleging that defendants were negligent in failing to establish a supervision program or in carrying out a policy that was otherwise required.

---

[1] Nonetheless, despite our statement in *Ross* that

> to determine the existence and scope of the individual's immunity from tort liability in a particular situation, the specific acts complained of, rather than the general nature of the activity, must be examined, [*id.* at 635,]

what emerges from *Ross,* as Justice Levin illustrates (*ante,* pp 358-359), is the exemption of activities involving initial governmental interaction. These activities are analogous to the decision to admit a person to, or discharge him from, a governmental hospital. Thus the results in *Ross* as well as the result in *Canon* with which all agree seem, perhaps unavoidably and perhaps appropriately, to reintroduce the notion of governmental function into governmental immunity analysis.

[2] Prosser & Keeton, Torts (5th ed), ch 25, § 131, pp 1041-1043.

I disagree with the majority view that the allegation must be read not as a failure to supervise, "since constant supervision was neither required nor possible on an outpatient basis . . . ." *Ante,* p 340. As the discussion of the underlying policy of the Mental Health Code, MCL 330.1001 *et seq.;* MSA 14.800(1) *et seq.,* illustrates, the majority's characterization of plaintiffs' allegation confuses the duty and negligence questions and the immunity issue. The policy underlying the Mental Health Code would be relevant to the question of the nature and extent of the defendant's duty to a person in outpatient status, but as the majority itself points out (*ante,* p 335, n 3), this is a different question than whether the activity in question is discretionary. In the latter context, we are to assume that there was a duty to supervise as alleged, and then to determine on an appropriately developed record not whether "constant supervision was neither required nor possible," but whether there is an alleged deviation from an alleged standard of care for the supervision of outpatients and, if so, whether that activity should be characterized as ministerial or discretionary. The first step in a cautious development of the law in this area would be clarification of the issues of duty and immunity for negligence. Prosser & Keeton, Torts (5th ed), ch 25, § 131, pp 1041-1043.

The record in this case does not support the statement that the allegations contained in ¶ 13(f) "must be read not as a failure to supervise, since constant supervision was neither required nor possible on an outpatient basis, but as a failure to professionally evaluate on a continuing basis the suitability of Marcia's participation in the outpatient program." *Ante,* p 340. Indeed, if the

defendant's motion was properly brought under GCR 1963, 117.2(1), only the factual allegations of the plaintiff are relevant. *Martin v Michigan,* 129 Mich App 100, 104-105; 341 NW2d 239 (1983), lv den 422 Mich 891 (1985). The plaintiffs have not pled that "constant" supervision was required to prevent the injuries to Marcia, nor have they pled that the only purpose of monitoring Marcia's progress within the program of treatment was for their own determination of the continuing suitability of outpatient care.

As noted, I agree with my colleagues that the decision in *Davis* not to involuntarily commit is immune under *Ross.* The decision not to provide a warning to a third person is, in my judgment, incident to the decision not to commit—a decision whether or not to engage in a particular activity well within the *Ross* immunity parameter. See MCL 330.1476(1); MSA 14.800(476)(1).

In sum, I agree with the majority that any act of a professional that deviates from professional standards is not ipso facto ministerial. Likewise, the fact that an individual defendant is a professional employee will not insulate the conduct in question from liability, particularly where safety standards may have been established by policy or practice and there are alleged deviations in execution or supervision.

The condition for imposition of liability on medical-professional employees was not an issue in *Ross,* although we certainly did not there imply that any distinction in definition for members of the teaching profession would be appropriate. The difficulty in these cases arises from a combination of several factors: from the complex and intricate nature of many of the judgments medical professionals are called upon to make, from the counter-

vailing consideration that allegations of medical malpractice frequently involve catastrophic damages, and from the undeniable pressure generated because we deal here with a category of cases that involve those in a "window" of potential liability.

In such a posture, recognizing that "the distinction between [discretionary and ministerial acts] is not . . . a distinction that judicial, academic or practicing lawyers have been able to define," Prosser & Keeton, *supra* at 1062, we would do well to proceed cautiously, particularly when examining the question in the context of a review of a motion for summary disposition.