*Michigan Supreme Court*
*Lansing, Michigan 48909*

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED JULY 31, 2002**

LINDA MACK,

    Plaintiff-Appellee,

v                             No. 118468

THE CITY OF DETROIT,
a Michigan Municipal Corporation,

    Defendant-Appellant.

_____

**BEFORE THE ENTIRE BENCH**

**YOUNG, J.**

Plaintiff alleges in this action that she was discriminated against in her employment as a Detroit police officer on the basis of her sex and sexual orientation in violation of the declaration of rights contained in the Charter of the city of Detroit. Plaintiff further contends that the charter creates a private cause of action allowing

recovery for violation of the rights set forth in it. Assuming the charter provides no explicit private right of recovery, plaintiff alternatively urges this Court to create, as a cumulative remedy available under the charter, such a cause of action.

We hold that regardless of whether the charter provides a private cause of action against the city for sexual orientation discrimination, such a cause of action would contravene the governmental tort liability act (GTLA), MCL 691.1407. Accordingly, we do not accept plaintiff's invitation to recognize such a cause of action.

Further, because the plaintiff failed to plead a recognized claim in avoidance of governmental immunity, her sexual orientation discrimination claim should have been dismissed. Governmental immunity is a characteristic of government and thus a plaintiff must plead her case in avoidance of immunity. To the extent that it holds otherwise, *McCummings v Hurley Medical Ctr,* 433 Mich 404; 446 NW2d 114 (1989), is overruled.

Accordingly, we reverse the Court of Appeals decision, reinstate the trial court's order of summary disposition in favor of the city of Detroit regarding the sexual orientation claim, and remand the case to the Court of Appeals for reconsideration of the sex discrimination claim in light of

this opinion.[1]

## I.  Facts and Procedural History

In 1974, plaintiff was hired by the city as a police officer.  During the course of her employment, she attained the status of lieutenant and held the positions of acting inspector, acting command lieutenant, acting administrative lieutenant, and acting inspector of the sex crimes unit.  The claims before the Court arose during plaintiff's tenure with the sex crimes unit.

Plaintiff alleges that, while working in the sex crimes unit, she was repeatedly propositioned by male supervisors for sex and that she rebuffed the unwelcome advances, in part because she is a lesbian.  Plaintiff complained to her superiors, who allegedly refused to take any action because of her sexual orientation.  Plaintiff also claims that she endured further discrimination and harassment as a result of her sexual orientation.  Specifically, she complains that the police department gave her an afternoon desk job answering phones, prohibited her from participating in any investigative work, and restricted her from taking more than two weekends

---

[1]The city appealed the Court of Appeals holding that the courts could recognize a private cause of action for sexual orientation discrimination under the city charter, but not the court's resolution of plaintiff's sex discrimination claim. For this reason, we remand the case to that Court for reconsideration of plaintiff's charter-based sex discrimination claim in light of this opinion.

off a month.  She has since retired from the police force.

Plaintiff filed suit, alleging intentional infliction of emotional distress and violations of the charter of the city of Detroit. Regarding the latter claims, plaintiff maintained that the city violated § 2 of the charter's declaration of rights by discriminating on the basis of sex and sexual orientation.[2]  The city moved for summary disposition, asserting that plaintiff failed to state a claim upon which relief can be granted, MCR 2.116(C)(8).  Specifically, the city argued that plaintiff's tort claims were barred by governmental immunity and that the city charter did not give plaintiff a private cause of action.  The trial court agreed with the city and granted its motion for summary disposition. Plaintiff appealed, arguing that the violation of the rights guaranteed by the city charter created a private cause of action.[3]

In a two-to-one decision, the Court of Appeals reversed,

---

[2]Section 2 provides:

> The city has an affirmative duty to secure the equal protection of the law for each person and to insure equality of opportunity for all persons.  No person shall be denied the enjoyment of civil or political rights or be discriminated against in the exercise thereof because of race, color, creed, national origin, age, handicap, sex, or sexual orientation.

[3]Plaintiff elected not to appeal the trial court's ruling dismissing the intentional infliction of emotional distress claim.  Therefore, those claims are not before this Court.

4

holding that plaintiff had a private cause of action for sex and sexual orientation discrimination. The majority reasoned that there is an express civil right to be free from employment discrimination based on one's sex arising under the Civil Rights Act, MCL 37.2101 *et seq.,* and that the city extended that protection to its charter.[4] Relying on *Pompey v General Motors,* 385 Mich 537; 189 NW2d 243 (1971), the majority concluded that equal opportunity in the pursuit of employment was a protected right, and because the city extended that protection to include sexual orientation discrimination, the courts could recognize, as a cumulative remedy, a civil action for such a claim.

The dissent opined that it was not clear that a city had authority to create a cause of action and questioned whether *Pompey* should be extended to rights created by city charters.

The city appealed the Court of Appeals holding that the judiciary could recognize a private cause of action for sexual orientation discrimination. We granted leave to appeal. 464 Mich 874 (2001).

## II.  Standard of Review

The issues presented are whether the city charter may create a cause of action against the city for sexual orientation discrimination in the face of state governmental

---

[4]243 Mich App 132; 620 NW2d 670 (2000).

immunity law and whether governmental immunity is an affirmative defense or a characteristic of government so that a plaintiff must plead in avoidance of it. These are questions of law that the Court reviews de novo. *Burt Twp v Dep't of Natural Resources*, 459 Mich 659, 662-663; 593 NW2d 534 (1999). We also review a trial court's decision to grant or deny a motion for summary disposition de novo. *Beaudrie v Henderson,* 465 Mich 124, 129; 631 NW2d 308 (2001). Because this is a motion for summary disposition brought under MCR 2.116(C)(8), we test the legal sufficiency of the complaint on the basis of the pleadings alone. *Id.*

### III. Discussion

#### A. Governmental Immunity

Plaintiff contends that the charter expressly creates a private cause of action for sexual orientation discrimination.[5] However, whether the charter attempted to create a private cause of action for sexual orientation discrimination is an irrelevant inquiry because we hold that

---

[5]In the alternative, plaintiff urges this Court to extend the holding in *Pompey* to recognize a cumulative remedy for sexual orientation discrimination under the charter. We decline to do so. Rather, we conclude that *Pompey* is inapplicable to the case before us. *Pompey* contemplated a cumulative remedy for discrimination in *private* employment, whereas plaintiff in this case seeks to impose liability on a *municipality*. Accordingly, unlike the Court in *Pompey*, we must address whether governmental immunity precludes the Court from recognizing a private cause of action for a municipality's tortious conduct except as expressly authorized by the Legislature.

6

the charter *could not* create a cause of action against the city without contravening state governmental immunity law.[6]

Const 1963, art 7, § 22 governs the authority of a city to enact a charter:

> Under general laws the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or enacted by the legislature for the government of the city or village. Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, *subject to the constitution and law*. No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of authority conferred by this section. [Emphasis added.]

Thus, although art 7, § 22 grants broad authority to municipalities, it clearly subjects their authority to

---

[6]Justice CAVANAGH's assertion that whether the charter creates a cause of action is a relevant inquiry because its answer affects causes of actions against nongovernmental entities ignores the fact that our opinion pertains only to actions against governmental entities. Because we are only addressing the creation of a cause of action against *a governmental entity*, whether the charter does or does not create such an action is ultimately irrelevant because the GTLA does not permit such an action. Our opinion does not address, as Justice CAVANAGH curiously alleges, whether a city can create a cause of action against *nongovernmental entities*.

We also point out that discrimination claims have always been characterized as a species of statutory tort. *Donajkowski v Alpena Power Co*, 460 Mich 243, 247; 569 NW2d 574 (1999). Consequently, Justice CAVANAGH's suggestion that a charter discrimination claim might not fall within the ambit of the GTLA is without foundation.

constitutional and statutory limitations.[7]

One such statutory limitation involves governmental immunity. In the governmental tort liability act (GTLA), the Legislature expressly stated that "[e]xcept as otherwise provided in this act, a governmental agency is immune from tort liability if [it] is engaged in the exercise or discharge of a governmental function." MCL 691.1407(1). Accordingly, a governmental agency is immune unless the Legislature has pulled back the veil of immunity and allowed suit by citizens against the government. The GTLA allows suit against a governmental agency in only five areas.[8] However, there are

_____

[7]This constitutional limitation on a municipality's authority is repeated in the Home Rule City Act, most emphatically in MCL 117.36, which states:

> No provisions of any city charter shall conflict with or contravene the provisions of any general law of the state.

See also MCL 117.4j(3), which governs permissible charter provisions:

> [Each city may in its charter provide] [f]or the exercise of all municipal powers in the management and control of municipal property and in the administration of the municipal government, whether such powers be expressly enumerated or not; for any act to advance the interests of the city, the good government and prosperity of the municipality and its inhabitants and through its regularly constituted authority to pass all laws and ordinances relating to its municipal concerns *subject to the constitution and general laws of this state*. [Emphasis added.]

[8]The five statutory exceptions to governmental immunity are the "highway exception," MCL 691.1402, the "motor vehicle

8

other areas outside the GTLA where the Legislature has allowed specific actions against the government to stand, such as the Civil Rights Act.[9] Further, municipalities may be liable pursuant to 42 USC 1983. *Monell v New York City DSS*, 436 US 658; 98 S Ct 2018; 56 L Ed 2d 611 (1978).

However, none of the exceptions where a suit is allowed against the government can be read to allow suit for sexual orientation discrimination. Likewise, no statute grants governmental agencies the authority to create an immunity exception for sexual orientation discrimination or waive immunity in the area of civil rights. Notably, the CRA, which makes a municipality liable for specific civil rights violations, neither provides a cause of action for sexual orientation discrimination nor grants municipalities the authority to create one. MCL 37.2101 *et seq*.[10] Moreover, the

exception," MCL 691.1405, the "public building exception," MCL 691.1406, the "proprietary function exception," MCL 691.1413, and the "governmental hospital exception," MCL 691.1407(4).

[9] MCL 37.2103(g) and 37.2202(a); see *Manning v Hazel Park*, 202 Mich App 685, 699; 509 NW2d 874 (1993) (governmental immunity is not a defense to a claim brought under the Civil Rights Act).

[10] Indeed, as this Court has consistently held since its seminal case, *Ross*, exceptions to governmental immunity are narrowly construed. See, e.g.*, Haliw v Sterling Heights*, 464 Mich 297, 303; 627 NW2d 581 (2001); *Nawrocki v Macomb Co Rd Comm,* 463 Mich 143, 149; 615 NW2d 702 (2000); *Ross v Consumers Power Co (On Rehearing),* 420 Mich 567, 618; 363 NW2d 641 (1984). Consequently, because the CRA does not recognize sexual orientation discrimination, that act cannot be construed as providing a basis for governmental agencies to

CRA limits complaints to causes of action for violations of the act itself:

> A person alleging a violation of *this act* may bring a civil action for appropriate injunctive relief or damages, or both. [MCL 37.2801(1) (emphasis added).][11]

In sum, without some express legislative authorization, the city *cannot* create a cause of action against itself in contravention of the broad scope of governmental immunity established by the GTLA. No such legislative act has recognized sexual orientation discrimination claims. Accordingly, this Court declines to circumvent the limitations placed on a municipality by the Legislature and recognize a cause of action against the city for sexual orientation discrimination.[12]

---

create such a cause of action.

[11]We make no determination regarding the validity of the city's attempt in its charter to provide a cause of action for sex discrimination, a protection similarly provided by the CRA. That claim is not before us. However, in keeping with this opinion, we note that, at least in regard to governmental immunity, a city may not alter in any respect its liability excepted from governmental immunity by the Legislature without express authority to do so.

[12]To be certain, we emphasize that our opinion does *not* address whether a city can create rights, protect against discrimination, or create a cause of action against a nongovernmental entity. Preemption of civil rights, by either the constitution or the Civil Rights Act, is not addressed by our opinion. Rather, our analysis concerns only governmental immunity and the city's lack of authority *to create a cause of action against a governmental entity* in light of state governmental immunity law. Accordingly, should there be any question concerning the scope of our holding, we hold that any

10

### B.  A City Cannot Waive Governmental Immunity

Because the city abandoned its assertion of governmental immunity to this Court and the law regarding the nature of governmental immunity has been misguided for some time, we will address the viability of plaintiff's complaint here as it pertains to governmental immunity.[13]

### 1.  The Nature of Governmental Immunity

A governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function.  MCL 691.1407(1).  This Court has taken steps to clarify the origin and history of governmental immunity, most recently in *Pohutski v Allen Park*, 465 Mich 675; 641 NW2d 219 (2002). See also *Ross v Consumers Powers (On Rehearing)*, 420 Mich 567; 363 NW2d 641 (1984).  The Court does not need to reiterate that history today, but we

---

attempt by the city to create a cause of action against itself in its charter for sexual orientation discrimination is preempted by the governmental tort liability act.  We have not addressed whether the CRA preempts a city from creating additional civil rights or protecting them through means other than the creation of a private cause of action, nor have we addressed whether a city can create a cause of action against a nongovernmental defendant.  Those questions are not before us.

[13]We note that the city raised governmental immunity as a defense in the trial court, but failed to argue this issue in the Court of Appeals or in this Court.  In light of our holding that governmental immunity is not an affirmative defense, but a characteristic of government, failure to assert its immunity on appeal does not preclude the Court from considering it now.

take this opportunity to clarify that governmental immunity is a characteristic of government. *Canon v Thumudo,* 430 Mich 326; 422 NW2d 688 (1988); *Hyde v Univ of Michigan Regents*, 426 Mich 223; 393 NW2d 847 (1986); *McCann v Michigan*, 398 Mich 65; 247 NW2d 521 (1976); *Markis v Grosse Pointe Park*, 180 Mich App 545; 448 NW2d 352 (1989); *Ross, supra at 621, n 34; Galli v Kirkeby,* 398 Mich 527, 532, 540-541; 248 NW2d 149 (1976). As such, plaintiff must plead her case in avoidance of immunity. See *Hanson v Mecosta Co Rd Comm'rs*, 465 Mich 492, 499; 638 NW2d 396 (2002); *Haliw v Sterling Heights*, 464 Mich 297, 304; 627 NW2d 581 (2001); *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143, 172, n 29; 615 NW2d 702 (2000); *Ross*, *supra* at 621, n 34. To the extent that it holds otherwise, *McCummings v Hurley Medical Ctr*, 433 Mich 404; 446 NW2d 114 (1989), is overruled.

Until 1989, it was well established in Michigan that governmental immunity was a characteristic of government. See, e.g., *Hyde*[14] and *Canon.*[15] In *McCann*, Justice Ryan stated that a plaintiff must plead facts in avoidance of immunity,

---

[14]"Unlike other claims of immunity, sovereign and governmental immunity are not affirmative defenses, but characteristics of government which prevent imposition of tort liability." *Id.* at 261, n 35 (citations omitted).

[15]"Unlike a claim of individual immunity, sovereign and governmental immunity are not affirmative defenses, but characteristics of government which prevent imposition of tort liability. A plaintiff therefore bears the burden of pleading facts in the complaint which show that the action is not barred by the governmental immunity act." *Id.* at 344, n 10.

reasoning:

> At first impression, it may appear appropriate
> to characterize governmental immunity as an
> affirmative defense. However, a careful analysis
> of the doctrine as construed by this Court
> indicates that, to plead a cause of action against
> the state or its agencies, the plaintiff must plead
> and prove facts in avoidance of immunity. In
> *McNair v State Highway Dep't*, 305 Mich 181, 187; 9
> NW2d 52 (1943), for instance, we held that the
> state's failure to plead sovereign immunity will
> not constitute a waiver because "failure to plead
> the defense of sovereign immunity cannot create a
> cause of action where none existed before." In
> *Penix v City of St Johns*, 354 Mich 259; 92 NW2d 332
> (1958), we held that a complaint which contained no
> averment that the defendant was engaging in a
> proprietary function, and which in fact alleged
> activity to which governmental immunity applied,
> stated no cause of action against the municipality.
> Thus, although we have on occasion referred to
> governmental immunity as a defense, see [*McNair*];
> *Martinson v Alpena*, 328 Mich 595, 599; 44 NW2d 148
> (1950), our past treatment of the doctrine
> indicates that its inapplicability is an element of
> a plaintiff's case against the state. [*McCann,
> supra* at 77, n 1 (opinion of RYAN, J.).]

This reasoning was reiterated nearly ten years later in *Ross*:

> In [*Galli*], four members of this Court held
> that plaintiffs must plead facts in their complaint
> in avoidance of immunity, i.e., they must allege
> facts which would justify a finding that the
> alleged tort does not fall within the concept of
> sovereign or governmental immunity. This may be
> accomplished by stating a claim which fits within
> one of the statutory exceptions or pleading facts
> which demonstrate that the tort occurred during the
> exercise or discharge of a non-governmental or
> proprietary function. See [*McCann, supra at* 77].
> Sovereign and governmental immunity are not
> affirmative defenses, but characteristics of
> government which prevent imposition of tort
> liability upon the governmental agency. *Galli,
> supra*, p 541, n 5; *McCann, supra*, p 77, n 1. [*Ross,
> supra* at 621, n 34.]

13

However, in *McCummings,* this Court departed from years of precedent and concluded that governmental immunity is an affirmative defense rather than a characteristic of government. The *McCummings* Court reasoned:

> The pronouncements in *Hyde* and *Canon* clearly do not square with the statement in *Ross* that "[s]overeign and governmental immunity from tort liability exist only when governmental agencies are 'engaged in the exercise or discharge of a governmental function.'" If it takes a legislative decree for immunity to exist, and then only under circumstances defined by the Legislature, how can it be said that sovereign or governmental immunity is a "characteristic of government?"

> We are persuaded that the reasoning in *Ross* is correct, i.e., that immunity from tort liability exists only in cases where the governmental agency was engaged in the exercise or discharge of a governmental function. The question whether a governmental agency was engaged in a governmental function when performing the act complained of is a question best known to the agency and best asserted by it. It naturally follows that plaintiffs need not plead facts in avoidance of immunity, but that it is incumbent on the agency to assert its immunity as an affirmative defense. The fact that the source of the immunity is a legislative act makes the contention of immunity no less a matter for assertion as an affirmative defense.

> We are also persuaded that there is no sound basis for requiring individuals, but not agencies, to assert governmental immunity as an affirmative defense. The source of the immunity from tort liability is the same. MCL 691.1407. Nor do we perceive any basis for treating the alleged immunity of a governmental agency any differently, for pleading purposes, from any other type of immunity granted by law. Immunity must be [pleaded] as an affirmative defense. [*Id.* at 410-

14

411.][16]

See also *Scheurman v Dep't of Trans*, 434 Mich 619; 465 NW2d 66 (1990); *Tyrc v Michigan Veterans' Fund*, 451 Mich 129; 545 NW2d 642 (1996).

We conclude that *McCummings* was wrongly decided and, returning to our prior precedent, overrule *McCummings'* conclusion that governmental immunity is an affirmative defense. MCL 691.1407(1) states, "[e]xcept as otherwise provided in this act, a governmental agency is immune from tort liability if [it] is engaged in the exercise or discharge of a governmental function." Thus, by its terms, the GTLA provides that unless one of the five statutory exceptions applies, a governmental agency *is* protected by immunity. The presumption is, therefore, that a governmental agency *is* immune and can only be subject to suit if a plaintiff's case falls within a statutory exception. As such, it is the responsibility of the party seeking to impose liability on a governmental agency to demonstrate that its case falls within one of the exceptions.

In addition to the textual support for this conclusion in the language of the GTLA, we note that the *McCummings* Court relied on a substantively flawed analysis in reaching the contrary opinion. First, the *McCummings* Court's reliance on

---

[16]The *McCummings* Court also amended MCR 2.111(F)(3) to reflect its holding. *Id.* at 412.

*Ross* to support its conclusion that governmental immunity is an affirmative defense is perplexing, given that *Ross* itself described governmental immunity as a characteristic of government. *Id.* at 621, n 34. Second, in support of its analysis the *McCummings* Court asked, "If it takes a legislative decree for immunity to exist, and then only under circumstances defined by the Legislature, how can it be said that sovereign or governmental immunity is a 'characteristic of government?'" *Id.* at 410-411.

In response, we merely observe that, historically, Michigan recognized at common law governmental immunity for all levels of government until *this Court* chose to abrogate governmental immunity for municipalities in 1961. *Williams v Detroit*, 364 Mich 231; 111 NW2d 1 (1961). In response to *Williams* and the possibility that this Court would further erode the remaining common-law governmental immunity for counties, townships, and villages, the Legislature enacted the Governmental Immunity Act of 1964 (GIA), thereby *reinstituting* governmental immunity protection for municipalities and preserving sovereign immunity for the state. In effect, the GIA restored the *Williams* status quo ante. *Pohutski, supra* at 682. Thus, contrary to *McCummings*, it did not take a legislative decree to *create* governmental immunity, but a legislative act to *preserve* the doctrine that this Court had

16

historically recognized as a characteristic of government. The *McCummings* suggestion that governmental immunity could not be a characteristic of government because it was created by legislation misapprehends the history of the Court's actions and the legislative response. We believe that once the sequence of the judicial and legislative events is grasped, the analytical flaw at the root of *McCummings* is apparent.[17]

For these reasons,[18] we overrule *McCummings*[19] to this extent and return to the longstanding principle extant before

---

[17]More important, notwithstanding that governmental immunity is now established by a legislative act rather than the common law, we hold that the Legislature is within its inherent constitutional authority to structure governmental immunity solely as it deems appropriate. Where the Legislature has afforded municipalities the protection of governmental immunity and done so in a comprehensive fashion as it has done in the GTLA, the governmental immunity as set forth in the GTLA is a *characteristic* of government.

[18]We note that requiring the plaintiff to bear the burden of pleading in avoidance of governmental immunity is also consistent with a central purpose of governmental immunity, that is, to prevent a drain on the state's financial resources, by avoiding even the expense of having to contest on the merits any claim barred by governmental immunity.

[19]In overruling *McCummings*, the Court is mindful of the doctrine of stare decisis. Stare decisis, however, is not meant to be mechanically applied to prevent the Court from overruling earlier erroneous decisions. *Robinson v Detroit*, 462 Mich 439, 463; 613 NW2d 307 (2000). Rather, stare decisis is a "principle of policy" not "an inexorable command," and the Court is not constrained to follow precedent when governing decisions are badly reasoned. *Id.* at 464. We conclude that it is appropriate to overrule *McCummings* despite stare decisis because that case was both badly reasoned and inconsistent with a more intrinsically sound prior doctrine and the actual text of the GTLA.

17

*McCummings* that, governmental immunity being a characteristic of government, a party suing a unit of government must plead in avoidance of governmental immunity.[20]

### 2. Plaintiff's Complaint

A plaintiff pleads in avoidance of governmental immunity by stating a claim that fits within a statutory exception or by pleading facts that demonstrate that the alleged tort occurred during the exercise or discharge of a nongovernmental or proprietary function. *McCann, supra* at 77. Plaintiff did neither in this case.

Governmental immunity protects the conduct of governmental agencies, which include two types of actors: the state and political subdivisions. MCL 691.1401(d). The Detroit Police Department, as a political subdivision, MCL 691.1401(b), is a "governmental agency" for purposes of

---

[20]We apply this holding to plaintiff's sexual orientation claim, but remand to the Court of Appeals for reconsideration of plaintiff's other claims, as indicated previously. See n 1. With the exception of her sexual orientation discrimination claim against the city, which is disposed of in this opinion, plaintiff shall be allowed to amend her complaint to attempt to plead in avoidance of governmental immunity in regard to her other claims.

As to all other cases pending that involve governmental immunity, plaintiffs shall be allowed to amend their complaints in order to plead in avoidance of governmental immunity. If a case is pending on appeal and governmental immunity is a controlling issue, the Court of Appeals may remand to allow amendment. As MCR 2.111(F)(3) encompasses other species of "immunity granted by law," but does not explicitly refer to governmental immunity, it is not necessary to amend the court rule because of our holding.

18

governmental immunity.  MCL 691.1401(d).  As such, absent the applicability of a statutory exception, it is immune from tort liability if the tort claims arise from the department's exercise or discharge of a governmental function.  MCL 691.1407(1).  "'Governmental function' is an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law."  MCL 691.1401(f).  It is well established in Michigan that the management, operation, and control of a police department is a governmental function.  *Moore v Detroit*, 128 Mich App 491, 496-497; 340 NW2d 640 (1983); *Graves v Wayne Co*, 124 Mich App 36, 40-41; 333 NW2d 740 (1983).

Plaintiff's claims regarding the police department all involve decisions that are part and parcel of the department's discharge of governmental functions.  The decisions at issue in this case are job reassignment, distribution of vacation time, and determining the extent to which department officers are involved in investigations.  These are ordinary day-to-day decisions that the police department makes in the course of discharging its governmental function.  As such, the police department's conduct is within the scope of § 7.  Thus, plaintiff's claim is barred unless it falls within one of the statutory exceptions.  As discussed above, plaintiff's sexual orientation discrimination claim falls under no immunity exception.

Further, plaintiff's complaint makes no mention of governmental immunity with respect to any of her claims. In fact, it was not until the city moved for summary disposition that plaintiff claimed that her action was not barred by governmental immunity. Even then, however, plaintiff's responsive pleading went only to her intentional infliction of emotional distress claim, which she abandoned by failing to raise it in the Court of Appeals.

Because plaintiff failed to state a claim that fits within a statutory exception or plead facts that demonstrate that the alleged tort occurred during the exercise or discharge of a nongovernmental or proprietary function, we conclude that plaintiff did not plead and could not plead in avoidance of governmental immunity and that her sexual orientation discrimination claim should have been dismissed on the city's motion for summary disposition.

### IV.  The Dissents

Justices Weaver and Cavanagh criticize our opinion primarily on the ground that our decision is allegedly reached without the benefit of briefing or argument. This argument camouflages their reluctance to address the core legal questions at hand.

First, concerning *McCummings*, additional briefing would not assist this Court in addressing this question of law. All the relevant argument is embodied in the years of case law on

the nature of governmental immunity.  Of that case law, *McCummings* is an aberration; its doctrine stands alone in our jurisprudential history in holding that governmental immunity is an affirmative defense and not a characteristic of government.   In this case, we addressed which was aberrational: *McCummings* or the remaining eighty years of case law.  We have concluded that *McCummings* was the aberration.

Regarding the dissenters' assertion that the issue of the charter being preempted by the GTLA was not briefed or raised by the parties, we note that the issue was squarely in front of the parties.  The central question in this case was whether the charter's purported creation of a cause of action for sexual orientation discrimination is preempted by state law.  The governmental tort liability act is a state law.  If the charter creates a cause of action for sexual orientation discrimination, then it conflicts with the state law of governmental immunity.   Questioning by several members of this Court at oral argument specifically raised the governmental immunity issue.[21]   We absolutely oppose the

---

[21]

*Justice TAYLOR*: . . . I've got a question which is on a little different track.  *Pompey* and *Holmes* in their most elementary reading give private causes of action for civil rights problems.  They, however, give that cause of action to one citizen against another.  One of the old really venerable principles of law is of course that the government can only be sued when it allows itself to be sued.  Why is it not the case that *Pompey* and *Holmes* could

dissenters' apparent position that although a controlling legal issue is squarely before this Court, in this case preemption by state law, the parties' failure or refusal to offer correct solutions to the issue limits this Court's ability to probe for and provide the correct solution. Such an approach would seriously curtail the ability of this Court to function effectively and, interestingly, given the dissenters' position, actually make oral argument a moot practice.

To be certain, we emphasize that, contrary to Justice

---

be left entirely intact and a court hold that whatever they said, they never abrogated the immunity that a government has that it can only eliminate expressly, that is the ability to not be sued. Said better, why wouldn't it be a sensible thing for a court to hold that whatever *Pompey* and *Holmes* said, they never gave authority to sue a city or any other kind of government, and there is nowhere in the statutes or the constitution where governmental immunity in this regard has been abrogated. And we always have to read our law, I think, our case law is that we always tilt in the direction of immunity.

\* \* \*

*Justice YOUNG*: Why do you read this provision [CRA] as abrogating governmental immunity? . . . .

\* \* \*

*Justice MARKMAN*: But Justice TAYLOR's question as I understand is a more generic question . . . It's whether the municipality can create any cause of action that will burden the sovereign to a greater extent.

CAVANAGH's allegation, we have not disregarded "the foundational principles of our adversarial system of adjudication." *Post* at 1. Rather, addressing a controlling legal issue despite the failure of the parties to properly frame the issue is a well understood judicial principle. See *Legal Services Corp v Velazquez*, 531 US 533, 549, 558; 121 S Ct 1043; 149 L Ed 2d 63 (2001) (majority and dissent both stating that whether to address an issue not briefed or contested by the parties is left to discretion of the Court); *Seattle v McCready*, 123 Wash 2d 260, 269; 868 P2d 134 (1994) (indicating that the court "is not constrained by the issues as framed by the parties if the parties ignore a constitutional mandate, a statutory commandment, or an established precedent"). In fact, all three dissenters recently signed or concurred in an opinion where this Court decided an issue not raised or briefed by any party. *Federated Publications, Inc v Lansing*, 467 Mich ___; ___ NW2d ___ (2002) (resolving a standard of review issue). Accordingly, we find no merit in the dissents' criticism of our opinion on the ground that the parties did not brief the issue themselves and interpret their dissenting statements as an indication of their reluctance to address the core legal questions before us.

In his dissent, Justice CAVANAGH has fired his standard shot: this Court overrules cases capriciously. Now he has

23

added a fusillade, suggesting that the majority "tees up" issues it wants the parties to brief, and somewhat inconsistently, that the majority decides matters *without* briefing by the parties. While we recognize that following the law as enacted by our Legislature is sometimes at odds with our dissenting colleague's personal policy preferences, our constitutional duty demands that we follow the rule of law. While Justice Cavanagh chooses to characterize his policy frustrations as the majority's judicial disobedience, neither the law, this Court's history, nor Justice Cavanagh's own judicial history supports his characterization.

On the so-called briefing issue, we think Justice Cavanagh wants it both ways. In this case, where the controlling legal issue was discovered after the parties had submitted their briefs, Justice Cavanagh complains. In other cases, when the Court has believed there might be a controlling issue on which it wanted the benefit of the parties' briefing, Justice Cavanagh also complains. See, e.g., *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000) (a case cited in his footnote 9), wherein Justice Cavanagh dissented, criticizing the majority for flagging in its grant order a legal issue the Court specifically wanted briefed by the parties. 461 Mich 1201.[22]

---

[22]For example, Justice Cavanagh cites *People v Hardiman*, 465 Mich 902; 638 NW2d 744 (2001), as an example of this Court

24

Apart from Justice CAVANAGH's desire to have it both ways on the issue of party "briefing," no one can seriously question the right of this Court to set forth the law as clearly as it can, irrespective whether the parties assist the Court in fulfilling its constitutional function. The jurisprudence of Michigan cannot be, and is not, dependent upon whether individual parties accurately identify and elucidate controlling legal questions.

Concerning Justice CAVANAGH's habitual assertion that *this* Court casually disregards stare decisis, we note that Justice CAVANAGH himself is no stranger to overruling precedent. See, e.g., *DiFranco v Pickard*, 427 Mich 32; 398 NW2d 896 (1986), overruling *Cassidy v McGovern,* 415 Mich 483;

_____

asking the parties if a precedent should be overruled, *People v Atley*, 392 Mich 298; 220 NW2d 465 (1974). We note that Justice CAVANAGH agreed that *Atley* should be overruled in his partial concurrence in *Hardiman*. 465 Mich 417, 432; 646 NW2d 744 (2002).

Similarly, Justice CAVANAGH criticizes this Court for asking the parties to brief whether the federal subjective entrapment test should be adopted in Michigan in our grant order in *People v Johnson*, ___ Mich ____; ___ NW2d ___ (2002). 465 Mich 911 (2001). However, when Justice CAVANAGH was in the majority, the Court asked the parties to do the very same thing in *People v Jamieson,* 436 Mich 61; 461 NW2d 884 (1990). 433 Mich 1226 (1989).

Finally, we note that in regard to the majority deciding issues not briefed by the parties, Justice CAVANAGH recently authored the opinion in *Stanton v Battle Creek*, 466 Mich ___; ___ NW2d ___ (2002), in which this Court decided an issue that was never briefed by the parties. That is, applying the common meaning of "motor vehicle" to determine whether the term encompasses a forklift.

25

330 NW2d 22 (1982); *AFSCME v Highland Park Bd of Ed*, 457 Mich 74; 577 NW2d 79 (1998), overruling *Ensley v Associated Terminals, Inc*, 304 Mich 522; 8 NW2d 161 (1943); *Haske v Transport Leasing, Inc*, 455 Mich 628, 652; 566 NW2d 896 (1997), overruling *Rea v Regency Olds/Mazda/Volvo*, 450 Mich 1201; 536 NW2d 542 (1995); *W T Andrew Co v Mid-State* Surety, 450 Mich 655; 545 NW2d 351 (1996), overruling *Weinberg v Univ of Michigan Regents*, 97 Mich 246; 56 NW 605 (1893); *People v Kevorkian*, 447 Mich 436; 527 NW2d 714 (1994), overruling *People v Roberts*, 211 Mich 187; 178 NW 690 (1920); *In re Hatcher*, 443 Mich 426; 505 NW2d 834 (1993), overruling *Fritts v Krugh*, 354 Mich 97; 92 NW2d 604 (1958); *Mead v Batchlor*, 435 Mich 480; 460 NW2d 493 (1990), overruling (to the extent inconsistent) *Sword v Sword*, 399 Mich 367; 249 NW2d 88 (1976); *Albro v Allen*, 434 Mich 271; 454 NW2d 85 (1990), overruling unidentified prior Supreme Court cases; *Schwartz v Flint*, 426 Mich 295; 395 NW2d 678 (1986), overruling *Ed Zaagman, Inc v Kentwood*, 406 Mich 137; 277 NW2d 475 (1979); *McMillan v State Hwy Comm*, 426 Mich 46; 393 NW2d 332 (1986), overruling *Cramer v Detroit Edison Co*, 296 Mich 662; 296 NW 831 (1941), and *Dawson v Postal Telegraph-Cable Co*, 265 Mich 139; 251 NW 352 (1933).

More important, we emphasize that this stout defense of stare decisis by Justices Cavanagh and Kelly is their standard

argument when they are unhappy with the result of an opinion. See *Sington v Chrysler Corp*, 467 Mich ___; ___ NW2d ___ (2002) (KELLY, J., dissenting). Their charge is that the new composition of this Court is the explanatory variable for a deteriorating respect for precedent. *Sington* provides the latest example of their argument, but it also demonstrates how statistically insignificant are the occasions when this Court (as opposed to its pre-1999 predecessor) has overturned its prior cases.

In *Sington*, Justice KELLY states that, in the five years from 1993 to 1997, twelve cases were overturned by this Court whereas in the four and a half years from 1998 to July, 2002, twenty-two cases were overturned. During the 1993 to 1997 period, the Court overruled precedent at a rate of about one-twelfth of one percent (12 of 13,682 cases disposed of), while during the 1998 to 2002 period, the Court overruled precedent at about a rate of one-fifth of one percent (22 of 11,190). The contrast is one-twelfth of one percent in the Court's "good ole days" versus one-fifth of one percent in the new world of the current Court, even counting against the current Court the six cases decided in 1998 before this majority came into existence. Viewed in this context, no neutral commentator would conclude that the majority has a complete disregard for stare decisis, but that the dissenters are strict adherents. In other words, Justice KELLY and Justice

CAVANAGH's records do not reflect a previous hard line adherence to stare decisis and their dissatisfaction is not with our alleged lack of adherence to stare decisis, but in their inability to reach the policy choice they prefer given the majority's commitment to follow the laws enacted by our Legislature.

I think it is fair to say that the cases Justice CAVANAGH cites in footnote 9 more probably reveal his desire that *this* Court never address a controlling legal issue. Yet, we welcome Justice CAVANAGH's newly announced repudiation of "judicial activism in any form." We question whether his new judicial philosophy includes the obligation to respect and follow the law, even where it is inconvenient to one's policy preferences or even when the parties fail to bring the controlling law to the Court's attention.

## V. Conclusion

We hold that regardless whether the charter attempted to create a private cause of action against the city for sexual orientation discrimination, it could not do so without contravening governmental immunity law. Accordingly, this Court is without authority to act on plaintiff's request to recognize such a cause of action.

In addition, we hold that, governmental immunity being a characteristic of government, a party suing a unit of government must plead in avoidance of governmental immunity.

28

We overrule *McCummings* to the extent it holds otherwise.

Plaintiff did not plead in avoidance of governmental immunity in her complaint. Accordingly, the Court of Appeals holding is reversed, and the trial court's order for summary disposition in favor of defendant is reinstated with regard to the sexual orientation discrimination claim. Because the city did not appeal the Court of Appeals resolution of the sex discrimination claim, we remand that issue to the Court of Appeals for reconsideration in light of this opinion.

CORRIGAN, C.J., and TAYLOR and MARKMAN, JJ., concurred with YOUNG, J.

S T A T E   O F   M I C H I G A N

SUPREME COURT


LINDA MACK,

    Plaintiff-Appellee,

v                                      No. 118468

THE CITY OF DETROIT,
a Michigan Municipal Corporation,

    Defendant-Appellant.
_____

CAVANAGH, J. (*dissenting*).

I respectfully disagree with the majority's conclusion that a cause of action created by defendant's city charter and brought against the city of Detroit would contravene the governmental tort liability act (GTLA), MCL 691.1407. I further object to the majority's assertion that plaintiff must plead in avoidance of governmental immunity.

In reaching its holding, the majority disregards the foundational principles of our adversarial system of adjudication. As protectors of justice, we refrain from deciding issues without giving each party a full and fair

opportunity to be heard.  But not for this concern, the judicially created doctrine of standing would be discarded, as it ensures "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination . . . ."  *Baker v Carr,* 369 US 186, 204; 82 S Ct 691; 7 L Ed 2d 663 (1962) (Brennan, J.).  However, the majority has disregarded such considerations, misconstruing the proper scope of its authority, by making dispositive an issue never argued or briefed by the parties.  Neither of the parties has had the benefit of sharing with this Court their thoughts on the effect of the tort immunity act on this case, though the implications of the majority's holding are vast.  Never before have I witnessed such overreaching conduct from members of this Court.

I.  THE GTLA DOES NOT NULLIFY PRIVATE ACTIONS CREATED BY A CITY

In the majority's haste to apply the GTLA, it fails to adequately consider several foundational issues.  First, the majority neglects to properly address a dispositive preliminary issue: is an action alleging a violation of a city charter a tort?  Neither plaintiff nor defendant considered this claim a tort.  Further, because a charter is a city's "constitution," *Bivens v Grand Rapids,* 443 Mich 391, 401; 505 NW2d 239 (1993), this action does not resemble our typical understanding of a tort.  It is far from clear that the

2

Legislature intended that the GTLA preclude such actions, and the majority's reference to *Donajkowski v Alpena Power Co,* 460 Mich 243, 247; 569 NW2d 574 (1999), which proclaimed in the most cursory fashion that a statutory violation sounds in tort, does not aid in this determination. At the very least, briefing and argument on this issue could have clarified the nature of the debate.

Moreover, the majority's claim that the scope of the GTLA nullifies any attempt by a city to create a cause of action that could be brought against a governmental agency ignores the fact that the tort immunity act does not bar gross negligence claims against government officers, MCL 691.1407(2), nor does it prohibit actions brought against government entities for injuries arising out of actions not related to the discharge of a "government function." MCL 691.1407(1). Thus, even if one concludes that plaintiff's claim against the city properly sounds in negligence, a cause of action created by the Detroit charter could be brought under the theory of gross negligence against government officers or against the city when not engaged in a government function. Therefore, the majority errs in concluding that *any* action created by a city's charter that could be brought against a governmental entity would violate the GTLA.

3

## II. The Charter Creates A Cause of Action

Having demonstrated why the issue is not "irrelevant," in spite of the majority's assertions otherwise, I believe it is necessary to clarify that the plain language of the charter creates a cause of action.[1]

The Detroit citizenry clearly has the right to be free from discrimination on the basis of, inter alia, sexual orientation:

> The city has an affirmative duty to secure the equal protection of the law for each person and to insure equality of opportunity for all persons. No person shall be denied the enjoyment of civil or political rights or be discriminated against in the exercise thereof because of race, color, creed, national origin, age, handicap, sex, or sexual orientation. [Charter, Declaration of Rights, § 2.]

Defendant city of Detroit, however, claims the plain language of the charter prescribes an exclusive administrative remedy for this broadly pronounced right, prohibiting enforcement by its citizenry:

> The city may enforce this declaration of rights and other rights retained by the people. [*Id.* at § 8.]

Defendant's cursory assertion that this provision prohibits individual enforcement of the rights granted in the charter

---

[1] See *Detroit v Walker,* 445 Mich 682, 691; 520 NW2d 135 (1994) ("The prevailing rules regarding statutory construction are well established and extend to the construction of home rule charters.")

4

results from an erroneous interpretation of the plain language of the text.[2]  Certainly this provision grants the city the authority to enforce the rights proclaimed in the charter.  However, this grant of authority is not exclusive.  The drafters gave the city the power to enforce the declaration of rights *and* other rights retained by the people.  If one accepts defendant's claim that this text gives the city the exclusive authority to enforce the declaration of rights, the drafters also would have granted to the city the exclusive authority to enforce "other rights retained by the people."  In other words, with the adoption of the charter *as constructed by defendant*, the people of Detroit purportedly stripped themselves of their ability to bring civil actions to enforce *any* "other right."  Even if the city had the authority to enforce these rights, the text simply does not support such an unprecedented grant of authority.

Further, the drafters used "may," not "shall," in this provision.  "May" suggests that one "is permitted to" or has discretion.  Black's Law Dictionary (7th ed).  If the drafters had intended to grant the city the exclusive authority to enforce the charter, they certainly would have used "shall," mandating such action.  *Id.* ("shall" implies a duty or

---

[2] This Court has certainly consistently eschewed any deviation from our "textualist" approach.

5

requirement).  Moreover, the citizens of Detroit surely did not intend to grant the city the discretionary *and* exclusive power to enforce both the rights under the charter and all others retained by the people.  Thus, by use of the permissive and discretionary term, the drafters indicated an intention to permit enforcement mechanisms beyond those powers granted to the city.  Any other interpretation ignores the text of the charter.

Reference to the city's ordinances supports this interpretation of the charter.[3]  In 1988, the city deliberately clarified that those who experienced discrimination on the basis of AIDS and conditions related to AIDS could bring a civil action to enforce their rights granted by the city.  Chapter 27, article 7 prohibits such discrimination in the employment, housing, business, and educational arenas.  See generally, §§ 27-7-1 to 27-7-90.  In particular, the charter prohibits discrimination in the provision of *public* facilities or services.  Section 27-7-7. The enforcement provision includes the following subsection:

> Any aggrieved person may enforce the provisions of this article by means of a civil action.  [Section 27-7-10(a).]

---

[3] *Brady v Detroit*, 353 Mich 243, 248; 91 NW2d 257 (1958) ("Provisions pertaining to a given subject matter must be construed together, and if possible harmonized.  It may not be assumed that the adoption of conflicting provisions was intended.")

6

Clearly, the city intended to create a civil cause of action for the victims of such discriminatory practices. Assuming drafters of the ordinance did not intend to contravene the charter, which we must, we may only conclude that the authority granted to the city in the declaration of rights, § 8, did *not* give the city the sole right to enforce the charter.

Although defendant correctly referenced ordinance 27-7-10, it draws the wrong conclusion. As noted, article 7 of chapter 27 was enacted in 1988. Detroit Ordinance § 24-88, July 14, 1988; see also Detroit Ordinance § 33-88, September 21, 1988. In contrast, the enabling ordinances at issue here were enacted in 1979. Detroit Ordinance § 303-H, January 24, 1979. It is entirely reasonable to conclude that the city simply intended to clarify that a private cause of action could be had under the charter when enacting § 27-7-10, as had been authorized implicitly by the charter.

The inclusion of § 27-2-10 was particularly appropriate because of the circuit courts' treatment of similar claims. In this case, for example, the court noted that this issue had arisen in the past. Without direction from the Court of Appeals, the trial court refused to recognize a cause of action. Certainly an ordinance or charter amendment that made clear that a cause of action existed for a violation of any

right provided by the charter would have made this exercise even simpler. However, its absence cannot force the conclusion that an action *only* for AIDS-related discrimination was intended. In this age of the overly rhetorical and often vacuous concern over "special rights," it is unreasonable to presume the charter permits individual actions for AIDS-related discrimination, but not for the other forms of discrimination enumerated in the declaration of rights, § 2. Therefore, though we often rely on the maxim that the inclusion of one term implies the exclusion of another, that inference loses force where the circumstances indicate otherwise.[4] In this case, the circumstances suggest the opposite, i.e., that the express provision of a cause of action for AIDS-related discrimination only *clarifies* that the charter permitted such actions for all violations.

Additional support for this conclusion can be found in the drafters' decision to include two provisions that suggest that Detroit's citizens retained the right to sue for violations of the charter. The declaration of rights clearly states:

> The enumeration of certain rights in this

---

[4] See *Luttrell v Dep't of Corrections,* 421 Mich 93, 102; 365 NW2d 74 (1984) (holding that "the effect of the rule '*expressio unius est exclusio alterius*,' while a valid maxim, [may be] so much at odds with the other [rules of construction] that reason dictates it [may be] inapplicable").

Charter shall not be construed to deny or disparage others retained by the people. [Declaration of Rights, § 7.]

In that same vein, the charter's chapter on human rights ends with the following proclamation:

> This chapter shall not be construed to diminish the right of any party to direct any immediate legal or equitable remedies in any court or other tribunal.  [Section 7-1007.]

This evidence indicates an intention to create a scheme whereby the administrative remedies supplement an individual's ability to bring a private cause of action.[5]  In light of this analysis, a rational interpreter must conclude that neither the drafters nor the citizenry intended to grant the city exclusive, discretionary authority to remedy violations of the rights granted in the charter.  Therefore, I would hold that the charter does, in fact, create a damages action for discrimination based on sexual orientation.

### III. IMMUNITY AS AN AFFIRMATIVE DEFENSE

The majority has opportunistically seized on the

---

[5]The charter's preamble provides additional support for the conclusion that the charter created both rights and remedies to which the city itself must adhere:

> We, the people of Detroit, do ordain and establish this Charter for the governance of our city, as it addresses the programs, services and needs of our citizens; . . . *pledging that all our officials, elected and appointed, will be held accountable to fulfill the intent of this Charter . . . .*  [Emphasis added.]

9

circumstances presented in this case to overrule decades of sound precedent and unsettle an area of law that had finally achieved some stability.  In proclaiming that plaintiff must plead in avoidance of immunity, the majority ignores not only the value of precedent, but also the sound principles on which *McCummings v Hurley Medical Ctr,* 433 Mich 404; 446 NW2d 114 (1989), was based.  In *McCummings*, the Court held that the entity claiming immunity must affirmatively plead the defense.  This unanimous pronouncement was based, in part, on the doctrine's statutory foundation.  No longer could we solely rely on the doctrine's common-law history to determine the parameters of the defense.[6]  Therefore, though the judiciary traditionally considered sovereignty a "characteristic" of government, this understanding was no longer dispositive of procedural or substantive issues once the Legislature codified the doctrine.  This view is no less relevant today, and the majority's attempt to proclaim otherwise by once again relying on outdated jargon adds little to our understanding of governmental immunity.

Having identified a flaw in the majority's deceptively useful rationale (i.e., because the Court has declared

---

[6] See Const 1963, art 3, sec 7 ("The common law and the statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed.")

immunity a "characteristic" in the past, it is not an affirmative defense), we must now turn to its substantive conclusions. Does the governmental immunity *statute* require that plaintiffs plead in avoidance of immunity? MCL 691. 1407(1) provides:

> Except as otherwise provided in this act, a government agency is immune from tort liability if [it] is engaged in the exercise or discharge of a governmental function.

Although this section makes clear that governmental entities may claim immunity when performing a governmental function, it does not, as the majority claims, create a textual presumption in favor of the government. Rather, the statute identifies the scope of immunity. The procedural duty to plead is simply not mentioned, and as such, the text-as it pertains to pleading-is silent.

Building on this Court's pronouncement in *Ross v Consumers Power (On Rehearing)*, 420 Mich 567; 333 NW2d 641 (1984), which clarified that the Legislature intended that immunity from tort liability exist only when an entity was engaged in a governmental function, the *McCummings* Court arrived at the most logical conclusion, i.e., that "[t]he question whether a governmental agency was engaged in a governmental function when performing the act complained of is a question best known to the agency and best asserted by it."

11

*Id.* at 411.[7]  Furthermore, the *McCummings* Court correctly noted that no valid reason to exempt agencies from the pleading burden placed upon individuals could be discerned. The source of immunity for both government bodies and individuals is grounded in § 1407.  Because the text makes no distinction in this regard, a prudent observer will agree that the majority's reversal is based on its own policy considerations, which ignore both the intent of the Legislature and the judicially sound doctrine of stare decisis.  This is particularly true because, though the Legislature revised the GTLA after *McCummings* in 1986, 1996, and 1999, it failed to amend the statute to alter the rule that placed the burden of pleading on the government. Unfortunately, the majority dismisses this legislative acquiescence, an indicator of its intent.

In sum, the fact remains that governmental immunity is a *defense* to liability.  Although the majority erroneously declares that plaintiff must plead in avoidance of the doctrine, the government continues to bear the onus of proof. If a trial court finds the parties have equally carried the

---

[7]The Court in *Ross* undertook an almost impossible task, clarifying more than a century's worth of judicial and legislative commentary on governmental immunity.  It did not, however, examine on which party the burden of pleading should fall.  Any reference to that burden in *Ross* does not, contrary to the majority's assertions, diminish the foundation on which the Court in *McCummings* relied.

12

burden of production concerning the applicability of the doctrine, the court must find for the plaintiff. Any indication to the contrary in the majority's opinion may only be referenced as dicta, as the issue this case presents is limited to the sufficiency of the pleadings.

Shockingly, without the issue being contemplated, let alone raised by the parties, the majority concludes that plaintiff's claim should have been dismissed for its failure to plead in avoidance of government immunity. Slip op at 2, 21-22, 26. However, our precedent and court rules had expressly placed this burden on the government. I object to the majority's application of its holding, which placed the burden of prescience on plaintiff.

#### IV. PRINCIPLES OF THE ADVERSARY SYSTEM

The majority's disingenuous response to the dissenting opinions requires clarification. The majority claims that any briefing on the propriety of the rule in *McCummings* would be a waste of time because "additional briefing would not assist this Court in addressing this question of law." Slip op at 22. This comment flies in the face of the foundations of our adversarial system, in which the parties frame the issues and arguments for a (presumably) passive tribunal. The adversarial system ensures the best presentation of arguments and theories because each party is motivated to succeed.

13

Moreover, the adversarial system attempts to ensure that an active judge refrain from allowing a preliminary understanding of the issues to improperly influence the final decision. This allows the judiciary to keep an open mind until the proofs and arguments have been adequately submitted.[8] In spite of these underlying concerns, the majority today claims that the benefits of full briefing are simply a formality that can be discarded without care. The majority fails to comprehend how the skilled advocates in this case could have added anything insightful in the debate over the proper interpretation of a century's worth of precedent. Whatever its motivation, the majority undermines the foundations of our adversarial system.

The majority also implies that the "central question in this case was whether the charter's purported creation of a cause of action for sexual orientation discrimination is preempted" by the GTLA. Slip op at 23. However, the extent of the parties' preemption briefing focused solely on the relevance of the Civil Rights Act vis-à-vis the charter-created cause of action. Moreover, the questions by this Court during oral argument do not substitute for proper

---

[8] See Hazard, *Ethics in the Practice of Law*, pp 120-123, 126-129, 131-135, cited in Tidmarsh & Trangsrud, *Complex Litigation and the Adversary System*, (New York: Foundation Press, 1988).

briefing, but only illustrate how the Court pursues its own end in a fashion unanticipated by the parties.

While occasionally a court may find it necessary to resolve an issue not briefed by the parties, the frequency with which the majority undertakes such activist endeavors demonstrates its desire to arrive at *its* destination.[9]

---

[9] The majority frequently engages in at least three distinct types of activist behavior: overruling precedent; in grants of leave, directing parties to address issues not initially raised or briefed by the parties in their application for leave to appeal; and, as in this case, holding dispositive issues neither raised nor argued before this Court.

To review instances where this majority has overruled precedent, see, e.g., *People v Cornell*, 466 Mich 335; ___ NW2d ___ (2002); *Koontz v Ameritech Svcs, Inc*, 466 Mich 304; 645 NW2d 34 (2002); *Robertson v DaimlerChrysler Corp*, 465 Mich 732; 641 NW2d 567 (2002); *Pohutski v City of Allen Park*, 465 Mich 675; 641 NW2d 219 (2002); *Hanson v Mecosta Co Rd Comm'rs*, 465 Mich 492; 638 NW2d 396 (2002); *Brown v Genesee Co Bd of Cmmr's*, 464 Mich 430; 628 NW2d 471 (2001); *People v Glass*, 464 Mich 266; 627 NW2d 261 (2001); *Nawrocki v Macomb Co Rd Comm*, 463 Mich 143; 615 NW2d 702 (2000); *Mudel v Great Atlantic & Pacific Tea Co*, 462 Mich 691; 614 NW2d 607 (2000); *Stitt v Holland Abundant Life Fellowship,* 462 Mich 591; 614 NW2d 88 (2000); *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000); *People v Kazmierczak*, 461 Mich 411; 605 NW2d 667 (2000); *McDougall v Schanz*, 461 Mich 15; 597 NW2d 148 (1999); *People v Lukity*, 460 Mich 484; 596 NW2d 607 (1999); *Ritchie-Gamester v Berkley*, 461 Mich 73; 597 NW2d 517 (1999).

For examples of grant orders which directed the parties' to address issues the majority found relevant, see *People v Glass*, 461 Mich 1005; 610 NW2d 872 (2000) (directing the parties to address whether the prosecutor's actions removed the taint of alleged racial discrimination in the grand jury selection process, whether MCR 6.112 conflicted with MCL 767.29, and whether the Court properly exercised its authority over criminal procedure).  See also *People v Hardiman*, 465

(continued...)

15

Mich 902; 638 NW2d 744 (2001) (directing the parties to brief whether "the inference upon inference rule of *People v Atley*, 392 Mich 298 (1974), was violated under the facts . . . and whether that decision should be overruled"); *People v Johnson,* 465 Mich 911; 638 NW2d 747 (2001) (directing the parties to brief whether this Court should adopt the federal subjective entrapment defense); *People v Reese,* 465 Mich 851; 631 NW2d 343 (2001) (directing the parties to "specifically address whether MCL 768.32 prevents this Court from adopting the federal model for necessarily lesser included offense instructions and, if it does, whether such prohibition violates Const 1963, art 6, § 5. In all other respects, leave to appeal is denied."); *People v Lett,* 463 Mich 939, 620 NW2d 855 (2000) (rejecting the prosecutor's concession concerning the constitutional nature of the error and directing the parties to address whether the trial court's declaration of a mistrial was based on manifest necessity; further ordering the parties to address six additional issues, including whether the defendant's claim was forfeited or waived and the extent to which the law might be clarified concerning presence of manifest necessity).

I thank the majority for pointing out that I object both when the parties have not had an opportunity to argue or brief an issue, *and* when the majority has forced the disposition of an issue not raised by either party. To clarify, it's not that I wish to have "it both ways," but that I object to judicial activism in any form.

Further, the majority accurately documents that, *throughout my twenty-year tenure* on this Court, I have, on occasion, found it necessary to overrule precedent or request briefing on an issue. The majority also clarifies that policy considerations may influence one's understanding of the appropriate method by which to apply or interpret the law. With this I do not disagree. Neither the majority nor I can escape the fact that, as judges, we are not computers, but human beings, doing our best to apply the law in an unbiased fashion, in accord with our constitutional mandate and within the strictures of the adversary system. Whether in the majority or the dissent, every justice must recognize and appropriately set aside such considerations in the execution of their duties under the law.

## V. Conclusion

Because a majority of this Court erroneously refuses to recognize that the charter creates a cause of action and that plaintiff need not plead in avoidance of immunity, there is no need to thoroughly analyze the remaining issues. Suffice it to say, I would hold that a municipality has the power, on the basis of the police powers inherent in its home rule authority, to protect its citizens from discrimination. No state law preempts this protection, and governmental immunity does not bar an action based not on a theory of tort liability, but on a violation of the organic law of a city granting its citizens fundamental rights. Therefore, for the reasons noted, I would affirm the judgment of the Court of Appeals.

KELLY, J., concurred with CAVANAGH, J.

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

LINDA MACK,

    Plaintiff-Appellee,

v

        No.  118468

THE CITY OF DETROIT,
a Michigan Municipal Corporation,

    Defendant-Appellant.

_____

WEAVER, J. (*dissenting*)

I dissent from the majority decision.

The majority has decided important issues involving governmental immunity that were not raised or briefed by the parties and that are very significant to the people of Detroit and all the people of Michigan.  The majority should have insured that it had briefing and heard argument on these issues before deciding them.

### A

Without the benefit of briefing or argument, the majority

overrules settled precedent[1] to hold that governmental immunity cannot be waived because it is a characteristic of government. In *McCummings v Hurley Medical Ctr,* 433 Mich 404, 411; 466 NW2d 114 (1989)*,* this Court held that governmental immunity must be pleaded as an affirmative defense. The majority overrules *McCummings* and holds that immunity is an unwaivable characteristic of government. The parties did not raise or address in any court whether governmental immunity is a characteristic of government or an affirmative defense.[2]

While the general concept of governmental immunity was alluded to in questioning during oral argument before this Court, the questioning did not reference the concept of immunity as a characteristic of government and did not foreshadow an intent to reconsider *McCummings*. The majority's decision to reach out and overrule a case that was not raised,

---

[1]The majority's assertion that *McCummings* is an "aberration" is their view. However, it was signed by six justices with Justice Griffin concurring separately and has been the law for fourteen years. See, e.g. *Scheurman v Dep't of Trans*, 434 Mich 619; 456 NW2d 66 (1990), and *Tyrc v Michigan Veterns' Fund*, 451 Mich 129; 545 NW2d 642 (1996).

[2]Although the city raised governmental immunity as an affirmative defense at the trial court level, the city never specifically addressed immunity relative to plaintiff's charter-based claim of sexual orientation discrimination at any level. The only briefing regarding immunity in the trial court was in response to plaintiff's intentional infliction of emotional distress claim. Plaintiff abandoned that claim in the trial court and thereafter, the city abandoned its immunity claim.

2

briefed, or argued is certainly efficient. However, the majority's efficiency in this case forsakes procedural fairness. It is worth emphasis that the majority can only conclude that the city has not waived governmental immunity by overruling *McCummings.*

I decline the majority's invitation to take a position without briefing and argument on whether governmental immunity is a characteristic of government, an affirmative defense, or some other judicially determined hybrid. These characterizations have significant procedural consequences. It is the role of the Court to respond to issues properly before it and to seek additional briefing and argument on significant matters that may have been overlooked by the parties. This is especially true where the issues are of great importance, such as the issues not briefed or argued in this case, which seriously affect the settled law of this state.

The majority's decision to address and resolve this issue without briefing or argument is inappropriate. Before deciding this significant change in the law of governmental immunity, the Court should have had briefing and argument.

B

The question whether a charter-created cause of action for sexual orientation discrimination conflicts with the

3

governmental tort liability act (GTLA), MCL 691.1407, a question that the majority concludes decides this case, was not briefed or argued by the parties at any level.[3] It is not possible to agree with the majority contention that this specific question was "squarely in front of the parties" when neither party addressed it at any level. *Ante* at 24. The conflict analysis of the parties and the courts below addressed whether a charter-created cause of action for sexual orientation discrimination conflicted with the Civil Rights Act (CRA). Furthermore, the city only characterized the question of conflict with CRA as one premised on the law of preemption in its brief to this Court. It is again worthy of note that it is only the majority's overruling of *McCummings* that allows the majority to shift the focus of the conflict analysis from the CRA to the GTLA.

C

Although the majority asserts that whether the electors of Detroit intended to create a cause of action to vindicate the charter-created civil right to be free from sexual orientation discrimination is an "irrelevant" inquiry, the intent of the electors, as expressed in the charter is

---

[3]The Michigan Constitution and the Home Rule City Act require that home rule city charters not conflict with state law.

4

noteworthy.[4]  After all, the issue presented at the outset of this case was whether the charter language created a cause of action to vindicate the charter's declaration of rights.

The charter's declaration of rights provides:

> The city has an affirmative duty to secure the equal protection of the law for each person and to insure equality of opportunity for all persons.  No person shall be denied the enjoyment of civil or political rights or be discriminated against in the exercise thereof because of race, color, creed, national origin, age, handicap, sex, or sexual orientation. [ Section 2.]

The language of § 2 is not ambiguous.  It, as would be commonly understood by the ratifiers, secures a set of rights to each person of Detroit.  Furthermore, § 8 of the declaration of rights provides:

> The city may enforce this Declaration of Rights and other rights retained by the people.

While it can be argued that the permissive "may" of § 8 tempers *the city's* otherwise "affirmative duty" under § 2 to "insure the equality of opportunity for all persons," it is by no means clear that, pursuant to § 8, the ratifiers intended to diminish the individual rights declared in § 2.  More importantly, the unambiguous language of the charter demonstrates that the charter ratifiers, the electors of

---

[4]Further, it should be of interest to the people of Detroit that the city's position in this litigation seeks to disclaim individual rights that its electors deemed worthy of charter protection.

5

Detroit, intended that the people of Detroit have the opportunity to seek enforcement of their charter-based rights in the proper court or tribunal. Art 7, ch 10, § 7-1007 provides:

> This chapter shall not be construed to diminish the right of any party to direct any immediate legal or equitable remedies in any court or other tribunal.

By these words the ratifiers of the charter would have expected that individuals could also vindicate their charter-declared rights in the proper court or tribunal.[5] In other words, it was the express intent of the electors of Detroit to raise the veil of immunity within the city limits with respect to the civil rights declared in the charter's declaration of rights.

The fact that the majority's decision leaves a charter-based right with no remedy[6] accentuates the inappropriateness of the majority's decision to dispose of this case on the

---

[5]As reiterated by the United States Supreme Court in *Davis v Passman*, 442 US 228, 242; 99 S Ct 2264; 60 L Ed 2d 846 (1979), "'The very essence of civil liberty,' wrote Mr. Chief Justice Marshall in *Marbury v Madison*, 5 US [1 Cranch] 137, 163; 2 L Ed 60 (1803), 'certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection.'"

[6]Section 8 of the charter declares that the city "may" enforce the declaration of rights, not that it "must" enforce those rights. If the city opts not to enforce the declaration of rights, as it may so choose to do under § 8, the individual Detroiter would have a right with no remedy.

6

basis of issues that were not raised, not briefed, and not argued by the parties.

KELLY, J., concurred with WEAVER, J.